# Douglas McArthur Buchanan, Jr.

### v.

# Commonwealth of Virginia

Record Nos. 890107 and 890108

September 22, 1989

Present: All the Justices

*Sam E. Eggleston, III (Gordon W. Poindexter, Jr.; Eggleston, Thelen & Johnson; Poindexter, Burns & Marks*, on brief), for appellant. (Record Nos. 890107 and 890108.)

*Virginia B. Theisen, Assistant Attorney General (Mary Sue Terry, Attorney General; Birdie H. Jamison, Assistant Attorney General*, on brief), for appellee. (Record Nos. 890107 and 890108.)

Justice Thomas delivered the opinion of the Court.

Douglas McArthur Buchanan, Jr. (Buchanan), was tried by a jury and convicted of capital murder in violation of Code § 18.2-31(g) (now Code § 18.2-31(7)), for killing his father, Douglas McArthur Buchanan, Sr. (Buchanan, Sr.), in the same transaction in which he killed his half-brother, Joel Jerry Buchanan (J.J.); his half-brother, Christopher Donald Buchanan (Donnie); and his step-mother, Geraldine Patterson Buchanan (Mrs. Buchanan). In the second phase of the bifurcated capital murder trial, the jury fixed Buchanan's sentence at death.

In the same trial, the jury also convicted Buchanan of the first degree murders of his father, his brothers, and his step-mother, sentencing him to life imprisonment for each murder. Code § 18.2-32. Further, the jury convicted Buchanan of use of a firearm in the commission of a felony with regard to each murder,

sentencing him to a total of fourteen years in prison for those convictions. Code § 18.2-53.1.

The trial court entered judgment on the capital murder conviction and sentenced Buchanan to death. It also entered judgment on the four first degree murder convictions and sentenced Buchanan to four terms of life imprisonment. In addition, the trial court entered judgment on the firearm convictions and sentenced Buchanan to fourteen years imprisonment.

Buchanan appealed the capital murder conviction to this Court. Record No. 890107. We have consolidated that appeal with the automatic penalty review required by Code § 17-110.1. Buchanan appealed the non-capital convictions to the Court of Appeals. Pursuant to Code § 17-116.06, by order dated January 30, 1989, we certified that appeal to this Court. Record No. 890108. We have consolidated all matters and have given the consolidated case priority on our docket. Code § 17-110.2.

Buchanan's principal complaints concern whether the indictments gave him fair notice of the charges against which he had to defend, whether the trial court unduly restricted *voir dire* questioning, whether he was entitled to second degree murder instructions, whether the jury's verdicts were sufficiently supported by the indictments, and whether his right to be free of double jeopardy was violated by the sentences he received. In our view, with certain modifications more fully explained herein, the trial court's judgment should be affirmed.

## I. FACTS

The murders occurred in a two-hour time period between 3:30 p.m. and 5:30 p.m. on September 15, 1987. On that day, Buchanan and his wife, Christianne, drove to a spot on the Blue Ridge Parkway which was a ten-minute walk through the woods to Buchanan, Sr.'s home. They discussed the contemplated murders. Indeed, they had discussed the murders the previous day and had driven to Buchanan, Sr.'s home, but defendant decided, at that time, that he could not follow through with the plan to kill his family. On September 15, however, Buchanan left his wife, in their parked vehicle and, carrying a pair of rubber gloves and his .22-caliber rifle, walked through the woods to his father's house.

Buchanan found his father outdoors behind the house. He explained his having the rifle by telling his father that he had been squirrel hunting. The two went inside where they engaged in con-

versation. They had a disagreement because Buchanan, Sr. made disparaging remarks about his first wife, defendant's deceased natural mother. Buchanan, Sr. charged that his present wife was unfaithful and that defendant's mother had been no better. Buchanan disputed the assertions about his mother. Buchanan, Sr. broke off the conversation and invited Buchanan outside to look at a recently purchased automobile. As Buchanan, Sr. walked towards the door, Buchanan placed the rifle to the back of his head and shot him. Buchanan, Sr. fell to the floor. Buchanan then placed the rifle to his father's forehead and shot him between the eyes. Next, Buchanan dragged his father's body into the master bedroom. He reached under his father's mattress and removed a .22-caliber pistol.

Fifteen minutes later, Buchanan heard his brothers arriving from school. He stood waiting behind the living room door, rifle in hand. Donnie, who was ten years old, came in first and walked past Buchanan who shot him in the back of the head. Buchanan then placed the rifle to Donnie's face and shot him near the right temple.

J.J., who was thirteen years old, heard the shots and started to run. Buchanan went outside to the porch and shot J.J. twice as he ran. He then helped J.J. walk inside the house where he shot him a third time, this time in the left side of the forehead. Buchanan dragged the bodies of both boys from the living room. J.J., however, despite his wounds, got up and walked back into the living room. Buchanan obtained a knife from the kitchen and stabbed J.J. five times. One stab wound pierced the skull and superficially penetrated the brain; another wound severed the carotid artery.

Buchanan waited inside the house until Mrs. Buchanan returned home. As she entered the house, he hid behind the front door. Once she was inside, he confronted her with the pistol aimed at her head. He pulled the trigger once, but the pistol did not fire. On his second attempt, the pistol fired; the bullet grazed the side of Mrs. Buchanan's head; she fell to her knees. He then took the knife he had used to kill J.J. and stabbed Mrs. Buchanan repeatedly. He stabbed her four times in her upper right chest. He slashed her throat from side to side, down to her vertebra column, severing the windpipe and all major veins and arteries in her neck. She also sustained defensive wounds to her hands.

Buchanan ran from the house through the woods to his parked vehicle. Along the way, he tossed his bloody tennis shoes and the

knife into a dumpster. As his wife drove him away, he tossed the rifle out of the window.

## II. INDICTMENTS

### A. *Sufficiency of Notice of Charges*

Buchanan contends the capital murder indictments against him did not give him sufficient notice of the charges against which he had to defend. He argues that the various indictments permitted the jury to convict him of more than one capital murder based on the death of the same person, Buchanan, Sr. According to Buchanan, his main defense to the capital murder charges was to show that the killings were not part of the same transaction. Buchanan submits that the multiple alternative indictments created a situation in which he was never aware of which killings the Commonwealth alleged were part of the same transaction. During oral argument, Buchanan stated that the issue is not whether he knew he was on trial for capital murder; this was conceded. Rather, Buchanan submitted, the real question is how many charges of capital murder can be based on four murders and what is the proper way to frame the indictments. Defendant contends he was prejudiced because he was unable to focus his defense on a specific pair of killings as being unconnected; instead, he was forced to argue that none of the killings were part of the same transaction.

The three capital murder indictments against Buchanan were based on then Code § 18.2-31(g), which provided, in pertinent part, as follows: "The following offenses shall constitute capital murder . . . (g) The willful, deliberate and premeditated killing of more than one person as a part of the same act or transaction . . . ." The first indictment charged, in essence, that Buchanan killed Buchanan, Sr. as part of the same act or transaction in which he killed J.J., Donnie, *or*, Mrs. Buchanan. The second indictment was in two counts; it charged, in essence, in Count I, that Buchanan killed Buchanan, Sr. and Donnie as part of the same act or transaction and in Count II, that Buchanan killed Buchanan, Sr. and Mrs. Buchanan as part of the same act or transaction. The third indictment was also in two counts; it charged, in essence, in Count I, that Buchanan killed Donnie and J.J. as part of the same act or transaction and in Count II, that

Buchanan killed J.J. and Mrs. Buchanan as part of the same act or transaction.

Buchanan's basic complaint is that because he killed four people in a relatively narrow time frame, he could only be indicted under Code § 18.2-31(g) for one capital murder. He contends the Commonwealth was required to make an election among the indictments. Buchanan misreads the statute and misunderstands the law concerning indictments.

■ The statute described capital murder as the "willful, deliberate, premeditated killing of more than one person as a part of the same act or transaction." This means that it took the killing of at least two people as part of the same act or transaction to constitute one capital murder under Code § 18.1-31(g). Here, four people were killed; thus, there was the theoretical possibility that Buchanan could be convicted of two capital murders. The critical issue is how many acts or transactions were involved. If all four individuals were killed in one act or transaction, Buchanan could only be convicted of one capital murder. If two individuals were killed as part of one act or transaction and the two others were killed as part of a second, different act or transaction, then Buchanan could be convicted of two capital murders.

■ But the theoretical limitation on the number of possible capital murder convictions that can be supported by four murders does not control the way in which the Commonwealth can frame indictments. The Commonwealth is free to indict an individual for as many separate crimes as the Commonwealth, in good faith, thinks it can prove. Further, the Commonwealth is free to charge the commission of a single offense in several different ways in order to meet the contingencies of proof. *See Bryant* v. *Commonwealth*, 189 Va. 310, 315, 53 S.E.2d 54, 56 (1949); R. Bacigal, *Virginia Criminal Procedure* § 13-6 (1983). The indictments of which Buchanan complains were proper. The Commonwealth was not required to make an election.

The three indictments put Buchanan on fair notice of what he was required to defend against at trial. Under the first indictment, Buchanan was on notice that he had to defend against a claim that he killed Buchanan, Sr. and *all three* of the other victims as part of the same act or transaction; that he killed Buchanan, Sr. and *any two* of the other victims as part of the same act or transaction; or that he killed Buchanan, Sr. and *any one* of the other victims as part of the same act or transaction. Thus, under the

first indictment, Buchanan was on notice that he had to defend against seven possible groupings of murder victims, any one of which was sufficient to constitute capital murder; but that Buchanan, Sr. was a necessary part of any of those groupings.

The second indictment was redundant. It put Buchanan on notice that he could be convicted of capital murder if the jury believed he had killed Buchanan, Sr. and Donnie as part of the same act or transaction, or if the jury believed he had killed Buchanan, Sr. and Mrs. Buchanan as part of the same act or transaction. This indictment was unnecessary because the first indictment provided for all possible groupings of victims in which Buchanan, Sr. was included. However, Buchanan has not described, and we do not perceive, any way in which he was prejudiced by the redundant nature of the second indictment.

The third indictment was not redundant. Whereas the first and second indictments required that Buchanan, Sr. be part of any grouping of two or more victims, the third indictment provided for the possibility that the jury might not believe that Buchanan, Sr. should be included as part of any grouping which was killed as part of the same act or transaction. Under the third indictment, Buchanan was on notice that he had to defend against the possibility that J.J. and Donnie were killed as part of the same act or transaction or that J.J. and Mrs. Buchanan were killed as part of the same act or transaction.

█ Thus, contrary to Buchanan's argument, he was never at risk of being convicted of more than one capital murder for killing the same person. The first and second indictments were in reality one indictment for capital murder in which Buchanan, Sr.'s death was a necessary part of a conviction. The third indictment permitted a conviction of capital murder in either of two situations where Buchanan, Sr.'s death did not come into play. Thus, at most, Buchanan faced conviction of two capital murders. But if he had been so convicted, there could not have been any overlap in the two pairs of murder victims on which the convictions were based. This was not a case of a defendant who had no idea what to expect when he came to court. When faced with defendant's attorney's argument that defendant had insufficient notice of the charges against him, the trial court remarked, "there's no way you don't know what he's charged with." We agree. *See Boggs* v. *Commonwealth*, 229 Va. 501, 519, 331 S.E.2d 407, 420 (1985).

## B. *Ruling Forbidding Reference in Opening Statement to the Specific Indictments*

Buchanan argues that he was prejudiced in defending himself because the trial court would not allow him to describe to the jury the specifics of the several indictments against him. Because Buchanan faced eleven indictments,[1] and because the trial court recognized the possibility that it might not instruct the jury on each indictment, the trial court directed that in opening statements counsel were to say no more than that Buchanan had been charged with capital murder for the killing of more than one person as part of the same act or transaction. Buchanan submits that because he could not discuss the details of the several indictments, he could not discuss what his evidence would be during trial. He submits further that because the indictments were improper and because he could not mention them, he was denied the opportunity to prepare an adequate defense.

Buchanan's argument is without merit. First, it is internally inconsistent. If it is his contention that the indictments were improper because they were more numerous than appropriate, then he would risk greater prejudice by mentioning them specifically than by not mentioning them other than in general terms. Further, although the argument on brief is that Buchanan was prejudiced because he was precluded from mentioning all the indictments, in oral argument Buchanan claimed prejudice because he faced redundant charges which were stacked up and which, because of their sheer number, left the jury with the impression that he was "bad."

We are of opinion that the trial court was fully within its authority when it instructed counsel not to make reference, in their opening statements, to the specific indictments. Such matters are within the discretion of the court. *O'Dell* v. *Commonwealth*, 234 Va. 672, 703, 364 S.E.2d 491, 509, *cert. denied*, 488 U.S. ____, 109 S.Ct. 186 (1988). We hold there was no abuse of discretion.

---

[1] Buchanan faced three capital murder indictments, four first degree murder indictments, and four indictments for use of a firearm in committing a felony.

## III. JURY SELECTION

### A. *Proposed Statement To Prospective Jurors*

Prior to the start of jury selection, Buchanan requested the trial court to read to the prospective jurors a statement prepared by the National Association of Criminal Defense Lawyers, which, according to Buchanan, was designed to "cushion" the effect of questioning prospective jurors about the death penalty. The trial court reviewed the statement and rejected it on the ground that it was not in accord with Virginia law.

■ The manner in which jury selection is conducted is within the discretion and control of the trial court, guided by statute and rule of court. *See* Code § 8.01-358; Rule 3A:14. There is no provision in Virginia law which requires a trial court to read to prospective jurors a statement offered by a defendant. We hold that the statement was properly rejected.

### B. *Request For Closed Individual Voir Dire*

Buchanan argues that the trial court erred by refusing to permit individual *voir dire* outside the presence of spectators and the press. His basis for this novel proposition includes his contention that due process standards are higher in death penalty cases (citing *Woodson* v. *North Carolina*, 428 U.S. 280 (1976)), and his reliance on a study of jurors conducted by the National Jury Project, Inc. Buchanan argues further that even if the trial court properly refused closed individual *voir dire*, it should have, at least, required individual *voir dire*.

■ A criminal defendant has no right to individual *voir dire*; the trial courts have broad discretion to decide how to conduct *voir dire*. *Fisher* v. *Commonwealth*, 236 Va. 403, 410, 374 S.E.2d 46, 50 (1988). It follows that there is no right to the more extreme measure of closed individual *voir dire*. Moreover, a decision to close a portion of a trial to the public would be fraught with problems of a constitutional nature. *See Press-Enterprise Co.* v. *Superior Court of Cal.*, 464 U.S. 501 (1984). We hold that the trial court did not err in refusing closed individual *voir dire*.

■ Buchanan's complaint that the trial court did not conduct individual *voir dire* defies the record. On the first day of trial, Buchanan's motion for individual *voir dire* was granted. All questioning on that day was done individually. On the second day of trial, the trial court asked the prospective jurors general questions

in groups of fifteen. Thereafter, each counsel asked his *voir dire* questions of individual prospective jurors. Buchanan participated in this procedure and did not object to it. He will not now be heard to complain. Rule 5:25.

### C. *Restrictions On Questions Asked by Defense Counsel*

During *voir dire*, the trial court would not allow Buchanan to ask the following two questions:

(1) From what you have read or heard about this case in the newspapers, what impression do you have about this case?

(2) Do you believe that a death sentence is the only appropriate punishment for capital murder?

Buchanan argues that because he could not ask these two questions, he was prejudiced in his efforts to discover any bias among the prospective jurors. We disagree.

Trial courts must afford a party a "full and fair" opportunity to ascertain whether prospective jurors "stand indifferent in the cause." *LeVasseur* v. *Commonwealth*, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), *cert. denied*, 464 U.S. 1063 (1984). However, it is within the trial court's sound discretion to decide when a defendant has had such an opportunity. *Id.*, 304 S.E.2d at 653. Further, trial courts are not required to allow counsel to ask questions which are so ambiguous as to render the answers meaningless. *See id.* at 579, 304 S.E.2d at 652-53. To be permissible, counsel's questions must be relevant in that they are such as would necessarily disclose or clearly lead to the disclosure of relationship, interest, opinion, or prejudice. *See* Code § 8.01-358. Where a trial court affords ample opportunity to counsel to ask relevant questions and where the questions actually propounded by the trial court were sufficient to preserve a defendant's right to trial by a fair and impartial jury, we will generally not reverse a trial court's decision to limit or disallow certain questions from defense counsel. *See LeVasseur*, 225 Va. at 582, 304 S.E.2d at 653; *Mackall* v. *Commonwealth*, 236 Va. 240, 251, 372 S.E.2d 759, 766 (1988), *cert. denied*, 492 U.S. ___, 109 S.Ct. 3261 (1989).

To ask a prospective juror his impression of a case may, through a circuitous route, lead finally to a disclosure of opinion or prejudice. But, as noted above, to be relevant, a question to a prospective juror must necessarily disclose or clearly lead to the disclosure of opinion or prejudice. We do not think the first question is of that kind. It is ambiguous and unfocused. It does not, for example, ask whether, based on news coverage, the prospective juror had formed an impression as to the defendant's guilt or innocence, or an impression as to whether defendant should or should not be executed, or an impression as to whether defendant was justified in his actions. Instead, Buchanan's proposed question appears to be an invitation to a rambling discourse on a broad range of emotions. In short, the start of a fishing expedition. However, to launch upon a fishing expedition of a prospective juror's general feelings about a case is not the aim of *voir dire*. The question was properly rejected.

■ Buchanan's next proposed question concerned the appropriateness of the death penalty in a capital murder case. It is almost identical to a question we rejected in a previous case on the grounds that it was vague, argumentative, and non-specific. In *Wm. Patterson* v. *Commonwealth*, 222 Va. 653, 659 n.*, 283 S.E.2d 212, 216 n.* (1981), we upheld the trial court's rejection of the following question: "Do you believe that the death penalty is ordinarily the proper punishment for the crime of capital murder?" The specific question Buchanan sought to ask was, "Do you believe that a death sentence is the only appropriate punishment for capital murder?" The question proposed in *Wm. Patterson* and the one proposed here are virtually the same. Buchanan's question was properly rejected.[2]

---

[2] We note further that the issues of jury bias and of attitudes towards the death penalty were fully and fairly explored by the trial court and counsel during *voir dire*. Jury selection took two days and covered more than 577 pages in the appendix. Buchanan complains that the trial court's questioning was of little use in selecting a jury because the trial court's questions were "close-ended" and "leading," while the questions Buchanan proposed were "open-ended" and "nonleading." Our review of the record discloses that the trial court's questions were not leading, but were proper, fair, and evenhanded. Moreover, it appears that Buchanan's so-called open-ended nonleading questions were nothing more than efforts to engage prospective jurors in rambling, unspecific, unfocused dialogues far removed from the core concern of *voir dire*, which is to determine whether jurors stand indifferent in the cause.

## D. *Claim of Trial Court Partiality in the Selection of Jurors*

Buchanan contends that his counsel were not treated fairly by the trial court in that they were criticized in the presence of prospective jurors. He argues, on the basis of *McLane* v. *Commonwealth*, 202 Va. 197, 205, 116 S.E.2d 274, 281 (1960), and *Wilson* v. *Commonwealth*, 2 Va. App. 134, 138, 342 S.E.2d 65, 67-68 (1986), that such conduct by a trial court constitutes reversible error. Even if Buchanan is correct about the legal proposition which he asserts, a question which we do not decide, his charges are baseless as a matter of fact.

Buchanan's first specific complaint is that the trial court criticized his counsel during the *voir dire* of prospective juror Baker. But this complaint is not properly before the Court. After questioning Baker, Buchanan's counsel stated, "We'll leave him, Judge. Mr. Buchanan has agreed to that." Rule 5:25.

Buchanan complains that when prospective juror Rucker stated to the court that he could not enter the jury box with an open mind and without regard to knowledge he had acquired, the trial court excused him. According to Buchanan, the trial court did not give him the opportunity to question Rucker. Quite apart from the obvious proposition that Buchanan could not be prejudiced by the trial court's striking a prospective juror who was biased against him, Buchanan made no request to question Rucker and made no objection to the trial court's ruling at the time it was made. Rule 5:25.

Buchanan argues that prospective juror Leroy Renalds was excused without giving Buchanan an opportunity to question him. But there was no attempt to ask questions and no objections were made to the trial court's ruling. Rule 5:25.

Buchanan contends further that the trial court showed partiality by excusing prospective jurors Weigand and Thomas for cause without giving him an opportunity to ask questions. Again, defendant made no attempt to ask questions and made no objections to the trial court's rulings.[3] Rule 5:25.

---

[3] Under a separate argument heading in his Brief, Buchanan includes jurors Weigand and Thomas in a group of five prospective jurors who he claims were struck for cause without his having a chance to question them. Just as Buchanan made no attempt to question Weigand and Thomas, the same is true for the three other jurors: Warrick, Renalds, and Taylor. Rule 5:25.

Buchanan also challenges the trial court's seating of prospective jurors Garrett and Barton. However, Buchanan expressly accepted both jurors. Rule 5:25.

Buchanan argues that the trial court improperly questioned prospective jurors Hedrick, Merryman, Hartberger, and Jedelsky. However, each of these prospective jurors was struck for cause. Further, because the *voir dire* of each potential juror was individual, no prospective juror heard the questioning of any other. Buchanan was not, and could not have been, prejudiced by the trial court's actions.

Buchanan next argues that the trial court showed partiality in its treatment of prospective juror Giles. Buchanan submits that because Giles indicated reservations about the death penalty, the trial court gave the Commonwealth's Attorney a chance to cross-examine her "in an effort to have the juror stricken for cause." However, the trial court seated this juror despite the Commonwealth's Attorney's motion to strike her for cause. There was nothing improper about the trial court's treatment of juror Giles.

Buchanan argues that he was prejudiced by the trial court's actions and comments during the *voir dire* of prospective juror Fitzgerald. He contends that the trial court interrupted his questioning and described one question as "sneaky." The trial court's statement was made after Fitzgerald had left the courtroom and no other prospective jurors were present. There was no prejudice to Buchanan from this comment.

Buchanan further complains that the trial court would not permit him to ask Fitzgerald: "Do you believe that the death sentence is the only appropriate sentence for capital murder?" We have ruled previously in this opinion that the trial court properly excluded that question. Further, the manner in which the court interrupted the questioning was not abrupt, abrasive, discourteous, rude, or indicative of bias. The trial court simply said: "Well, see that's not a proper question because he's not presumed to know what the law is . . . ."

The trial court also would not allow Buchanan to ask Fitzgerald "Do you believe that there are any circumstances in a capital case that would warrant life imprisonment rather than the death penalty?" The trial court excluded the question on the grounds that it was hypothetical and that the trial court already had asked the same question more than three times. Again, we find nothing abrupt, abrasive, discourteous, rude, or indicative of bias in the man-

ner of the questioning.[4] We find no bias in the trial court's handling of Fitzgerald's questioning.

 After setting forth all of the foregoing occurrences, Buchanan argues that he has shown that the trial court was more intent on seating an Amherst County jury than in seating an impartial jury. He states further that "[t]his summary of the *voir dire* procedure demonstrates that the court abused its discretion in the conduct of *voir dire*." We think it proves just the opposite. The trial court conducted proper *voir dire*, which has been subject to unfounded attack by Buchanan in this appeal. We hold that the trial court did not display bias or partiality towards the Commonwealth.

### E. *Motion For Additional Peremptory Strikes*

Buchanan moved for additional peremptory strikes. The trial court rejected his motion. Buchanan argues, in essence, that because this is a capital murder case, he was entitled to additional strikes. He contends that if he had had such further strikes he would have used them to strike prospective juror Baker.

 The request was properly denied. There is no basis in Virginia law for additional peremptory strikes. Code § 19.2-262. *See O'Dell*, 234 Va. at 690, 364 S.E.2d at 501 (1988).

## IV. VENUE AND SEQUESTRATION

### A. *Venue*

Buchanan moved for a change in venue on the ground that the setting of the trial was inherently prejudicial and that there was a reasonable likelihood that he would not receive an impartial jury. He claims prejudice based largely upon a newspaper article published in the community four days before trial. The article reported that his wife had been convicted of four first degree murders as his accomplice. Buchanan argues further that several of the prospective jurors, including some who were seated, admitted being aware of the outcome of his wife's trial. Buchanan sub-

---

[4] The question itself, though objected to, was not brought to this Court under any assignment of error; thus we are not called upon to decide, nor do we decide, whether it was properly excluded. It was cited here only in an effort to show bias on the part of the trial court.

mits that, under these circumstances, the failure to change venue denied him an impartial jury.

Buchanan argues further that the trial court utilized an erroneous legal test in deciding the motion to change venue. According to Buchanan, the trial court ruled that the only way to overcome the presumption that a defendant can receive a fair trial in his venue is to be unsuccessful in an attempt to seat a jury. Buchanan submits that the correct test is whether, under the totality of the circumstances, a defendant will receive an impartial jury.

We turn first to the question whether the trial court was correct in attempting to seat a jury before he ruled on the motion to change venue. Although Buchanan now complains of the trial court's approach, at trial he agreed to it; his counsel stated as follows:

> I think [the Commonwealth's Attorney] is right in his assessment that under Virginia law we have to try to seat a jury, but this motion has to be made at this time so that we have on record that we think it's going to be difficult to seat a jury in this case.

In addition, the trial court's approach to resolving the venue question was fully in accord with established Virginia law. Venue decisions are entrusted to the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion. *Mackall*, 236 Va. at 250, 372 S.E.2d at 765; *Gray* v. *Commonwealth*, 233 Va. 313, 333, 356 S.E.2d 157, 168, *cert. denied*, 484 U.S. 873 (1987); *Boggs*, 229 Va. at 513, 331 S.E.2d at 417. Further, a criminal defendant who challenges venue confronts a presumption that he can receive a fair trial from a jury of the vicinage. *Mackall*, 236 Va. at 250, 372 S.E.2d at 766; *Boggs*, 229 Va. at 513, 331 S.E.2d at 417. To overcome this presumption, a defendant has the burden of "establishing clearly such a pervasive prejudice among the citizens of the venue of the crime as to make it reasonably certain that he will not receive a fair trial." *Mackall*, 236 Va. at 250, 372 S.E.2d at 766; *Stockton* v. *Commonwealth*, 227 Va. 124, 137, 314 S.E.2d 371, 379-80, *cert. denied*, 469 U.S. 873 (1984). *See Murphy* v. *Florida*, 421 U.S. 794, 803 (1975).

Jurors are not required to be totally ignorant of the facts and issues in a case. *Irvin* v. *Dowd*, 366 U.S. 717, 722 (1961).

Consequently, the mere showing of extensive publicity or general knowledge of a crime or of the accused, including his criminal record, is not enough to justify a change of venue. *See Mackall*, 236 Va. at 250, 372 S.E.2d at 766; *see also Boggs*, 229 Va. at 513, 331 S.E.2d at 417; *Dobbert v. Florida*, 432 U.S. 282, 303 (1977).

In deciding whether a change in venue is warranted, it is pertinent whether the publicity concerning the case is factually accurate, temperate, and noninflammatory. *See Washington v. Commonwealth*, 228 Va. 535, 544, 323 S.E.2d 577, 583 (1984), *cert. denied*, 471 U.S. 1111 (1985); *see also Mackall*, 236 Va. at 250, 372 S.E.2d at 766; *Gray*, 233 Va. at 333, 356 S.E.2d at 168. Also pertinent is the relative ease with which the jury was selected. *See Mackall*, 236 Va. at 250, 372 S.E.2d at 766; *Pope v. Commonwealth*, 234 Va. 114, 120, 360 S.E.2d 352, 356 (1987), *cert. denied*, 485 U.S. 1015 (1988); *Washington*, 228 Va. at 544-45, 323 S.E.2d at 583. This is so because the relative ease of seating an impartial jury negates the existence of the "widespread prejudice" which a criminal defendant must show to justify a change in venue. *Pope*, 234 Va. at 120, 360 S.E.2d at 356.

Here, in his motion to change venue, Buchanan complained of a large amount of publicity but not that the publicity was false. The trial court considered the various news articles submitted by Buchanan and ruled that "[t]hey were just factual articles telling what actually had happened."

Buchanan also complained that eight of the twelve jurors came from one particular part of the county. The trial court ruled that the master jury list had been randomly drawn, that the jury selection process involved questioning thirty-six prospective jurors to select a panel of twenty, and that there was nothing unusual about the selection process or the fact that those ultimately chosen to sit were from any one part of the county.

We are fully persuaded that Buchanan has failed to meet his burden of proof of an abuse of discretion on the part of the trial court. The record supports the trial court's conclusion that selecting the jury was relatively easy, that the publicity was accurate and noninflammatory, and that there was no indication of "widespread prejudice" against Buchanan in the community. We hold that the trial court did not err in denying the motion for change in venue.

## B. *Sequestration*

The trial court denied Buchanan's motion to sequester the jury. His appeal of this issue is based essentially on *Stockton* v. *Commonwealth*, 852 F.2d 740 (4th Cir. 1988), *cert. denied*, ____ U.S. ____, 109 S.Ct. 1354 (1989). However, in that case, which was on federal habeas review of this Court's decision in *Stockton* v. *Commonwealth*, 227 Va. 124, 314 S.E.2d 371 (1984), the Fourth Circuit noted specifically that its grant of habeas relief to Stockton was not based on any abuse of discretion in denying sequestration: "We do not hold that the trial court abused its discretion in refusing to . . . sequester the jury." *Stockton*, 852 F.2d at 746. The question whether to sequester the jury is entrusted to the sound discretion of the trial court and the trial court's decision in that regard will not be disturbed absent a showing of an abuse of discretion. *See e.g.*, *Pope*, 234 Va. at 121, 360 S.E.2d at 357; *Gray*, 233 Va. at 340, 356 S.E.2d at 172; *Jones* v. *Commonwealth*, 228 Va. 427, 442-43, 323 S.E.2d 554, 562 (1984), *cert. denied*, 472 U.S. 1012 (1985). The trial court did not abuse its discretion. At the end of each day of trial, the court admonished the jury not to read the newspapers, watch television, or discuss the case with anyone. Buchanan now complains that when trial convened each morning, the trial court did not ask whether the jurors had abided by its instructions. Buchanan neither requested such questioning at trial nor objected to the lack of it. Rule 5:25. Unless it is shown otherwise, we will presume that jurors follow the trial court's instructions to avoid exposure. *See Jones*, 228 Va. at 443, 323 S.E.2d at 562; *Waye* v. *Commonwealth*, 219 Va. 683, 701, 251 S.E.2d 202, 213, *cert. denied*, 442 U.S. 924 (1979).

We hold that the trial court did not err in denying the motion to sequester the jury.

## V. INSTRUCTIONS ON LESSER OFFENSES

Buchanan contends he was entitled to a second degree murder instruction with regard to each of the murders. With regard to his father's murder, Buchanan contends there was evidence that he shot his father only after he became angry about disparaging remarks his father had made concerning Buchanan's deceased natural mother. In oral argument, Buchanan's counsel explained that his claim of the appropriateness of a second degree murder instruction was based on the fact that defendant said he got "mad."

Buchanan submits that, in light of his testimony, the jury could have believed that he "acted in the heat of passion and killed his father out of anger rather than as a result of premeditation."

With regard to the murder of his brothers and his step-mother, Buchanan does not rely upon any facts as the basis for his claim of a right to second degree murder instructions. Instead, he relies on *Painter v. Commonwealth*, 210 Va. 360, 171 S.E.2d 166 (1969), for the general proposition that all homicide is presumed to be second degree murder. He then argues that this case is similar to *Painter* in which this Court held that the failure to grant a second degree murder instruction was reversible error.

■ We have long recognized that evidence showing a murder "to have been deliberate, premeditated and wilful could be so clear and uncontroverted that a trial court could properly refuse to instruct on the lesser included offenses." *Painter*, 210 Va. at 366, 171 S.E.2d at 171. It follows, therefore, that a criminal defendant "is not entitled to a lesser degree instruction solely because the case is one of murder." *Clark v. Commonwealth*, 220 Va. 201, 209, 257 S.E.2d 784, 789 (1979), *cert. denied*, 444 U.S. 1049 (1980).

■ A second degree murder instruction is only appropriate where it is supported by evidence. *Justus v. Commonwealth*, 222 Va. 667, 678, 283 S.E.2d 905, 911 (1981), *cert. denied*, 445 U.S. 983 (1982); *Painter*, 210 Va. at 367, 171 S.E.2d at 171. Moreover, the evidence asserted in support of such an instruction "must amount to more than a scintilla." *Justus*, 222 Va. at 678, 283 S.E.2d at 911; *Hatcher v. Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978).

The foregoing legal principles leave no doubt that Buchanan was not entitled to second degree murder instructions with regard to the murders of Mrs. Buchanan, J.J., and Donnie. Buchanan's claim for such instructions with regard to those murders is nothing more than the reassertion of the long-rejected contention that a second degree murder instruction should be granted in any murder case. We hold that the trial court did not err in rejecting Buchanan's request for second degree murder instructions concerning the murders of his step-mother and two brothers.

With regard to the murder of his father, Buchanan submits that because he argued with his father and got "mad" before he shot him, he was entitled to a second degree murder instruction. The question is whether the evidence to which Buchanan points was

more than a scintilla. To resolve this question, we must focus upon Buchanan's testimony concerning his father's murder.

Buchanan confessed twice and testified at trial. Each time he admitted that his wife knew what he was going to do before he did it. In his first confession and at trial, he admitted that he and his wife drove to the Buchanan house on September 14, the night before the murders, in order to kill his family, but that he could not commit the murders at that time. In each version of the events of September 15, Buchanan admitted walking to his father's house carrying a loaded .22-caliber rifle. In his second confession, he admitted that he wore rubber gloves when he committed the murders.

Buchanan's descriptions of what transpired just prior to his father's murder were as follows: In his first confession, he stated that he and his father were inside the house talking but his father did not ask how Buchanan and his wife were doing. Buchanan said this omission "was really making [him] mad." He stated that he and his father started arguing but he immediately explained without any prodding from the examiners that: "I mean it wasn't — I mean it wasn't a heated argument." Buchanan continued: "All right — then he started to walk out the door and I shot him." Buchanan's interviewer asked him to explain exactly what happened. Buchanan replied, "[h]e turned around instead of walking out the door and I shot him from behind." Asked what happened next, Buchanan answered: "And then he fell to the ground and I shot him again."

Buchanan was then asked specifically whether he and his father were arguing at the time Buchanan, Sr. was killed; Buchanan said no: "See we weren't arguing at the time. What he was doing was gonna show me his blue Nova [automobile], cause I hadn't seen it before." The interviewer asked what lead up to the murders; Buchanan replied: "They never treated me like a son — they treated me like an outsider all the time. I mean — I don't think they cared." Again Buchanan was asked whether it was any particular thing that "set it off at this particular time." He replied: "there was no one thing that they could of done that — would have done that, it's just that I mean, they never talked to me when I was living there."

In his second confession, Buchanan stated that he and his father were inside the house talking "and started arguing — not really arguing but just, you know, just disagreeing, mostly. And just

hassling — it's been going on between us and things like that. Then uh he wanted to talk and showed me the — the newest Nova that he had." Buchanan stated further that: "And uh and then I shot him then — before he went out the door." When asked where he shot his father, Buchanan replied: "From the back — in the back of the head." Then Buchanan shot his father again, this time in the face.

At trial, on direct examination, Buchanan said that he and his father were inside the house talking when his father said that Mrs. Buchanan was cheating on him. Buchanan suggested that his father get a divorce. His father replied that "it would have been the same way if [Buchanan's] . . . real mother was alive." Buchanan testified that as his father talked, *his father* was getting "pretty mad" at Buchanan. Buchanan's counsel asked him how he felt when his father said his deceased natural mother would have been unfaithful; Buchanan responded: "I was getting mad. I was sweating. I was getting real hot and I was shaking." When Buchanan tried to defend his natural mother, his father broke off the conversation saying "that's it, let's go out and look at this car I bought for J.J." These questions and answers followed:

Q. And then what happened?

A. Then he started to walk out the door and I shot him.

Q. Why did you do it?

A. I don't know. I was just mad. I just was — I don't know really why I did it. I didn't mean to. It just happened.

Q. Well, what happened after you shot him?

A. I just kind of stared at him for a minute — I don't know — I didn't know — I was scared — I didn't know what to do. And then I shot him again.

On cross-examination, Buchanan testified that the argument with his father had not been heated: "It wasn't really heated. It's just that he yelled at me a couple of times." "It was no stand up arguing or pushing or anything like that." "[W]e were both getting mad, but we were not pushing or fighting." Buchanan also admitted that his father tried to call off the disagreement by sug-

gesting that he and his son go outside to look at a car. Buchanan further admitted that when he pulled the trigger he intended to kill his father.

■ We are of opinion that Buchanan was not entitled to a second degree murder instruction regarding his father's murder. This murder was planned. The only reason it was not carried out the day before was because Buchanan made a conscious decision not to do it at that time. But, the next day, he returned to his father's house prepared to kill and intending to kill.

Buchanan did not say he killed in anger. He did not say he felt provoked. He did not say he shot without thinking. His father had broken off the disagreement and turned his back to walk out the door when Buchanan — having time to think and, by his own admission, intending to kill — shot him in the back of the head. "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Giarratano* v. *Commonwealth*, 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980). *See Barnes* v. *Commonwealth*, 234 Va. 130, 136, 360 S.E.2d 196, 201 (1987); *Bradshaw v. Commonwealth*, 174 Va. 391, 399, 4 S.E.2d 752, 755 (1939). Once his father fell, Buchanan shot him between the eyes. In our view, Buchanan relies on but a scintilla of evidence to support his motion for a second degree murder instruction; this is not enough. The evidence to which he points falls far short of proving provocation, anger, passion, or any other fact that might serve to convince a jury that Buchanan acted without premeditation. We hold that the trial court did not err in denying Buchanan's request for a second degree murder instruction concerning his father's murder.

## VI. CONSTITUTIONAL CHALLENGE
## TO THE STATUTORY SCHEME

### A

■ Buchanan contends that the Virginia death penalty statute is unconstitutional because it commits the sentencing decision to the unbridled discretion of a judge or a jury. This challenge to the Virginia statute is not new and has previously been considered and rejected. *See, e.g., Hoke* v. *Commonwealth*, 237 Va. 303, 305, 377 S.E.2d 595, 597, *cert. denied*, 491 U.S. ____, 109 S.Ct. 3201 (1989); *Pope*, 234 Va. at 121-22, 360 S.E.2d at 357; *Gray*, 233

Va. at 320, 356 S.E.2d at 160; *Stockton*, 227 Va. at 134-35, 314 S.E.2d at 378. We adhere to our previous rulings.

## B

 Buchanan also contends that Code § 18.2-31(g), the provision under which he was convicted of capital murder, was unconstitutional. The statutory provision read as follows: "The following offenses shall constitute capital murder . . . (g) The willful, deliberate and premeditated killing of more than one person as part of the same act or transaction . . . ." Buchanan contends that the term "transaction" is inherently ambiguous. He submits that the term "encompasses such a broad spectrum of behavior that it does not sufficiently limit the circumstances, for which one can receive the death penalty."

We considered and rejected this precise argument in *Woodfin* v. *Commonwealth*, 236 Va. 89, 372 S.E.2d 377 (1988). There, we explained that a "penal statute is void for vagueness if it fails to give a person of ordinary intelligence notice that his contemplated conduct is forbidden by the statute and if the enactment encourages selective law enforcement." *Id.* at 92, 372 S.E.2d at 379. In *Woodfin*, we said there was nothing uncertain or ambiguous about the phrase "same act or transaction" when it was applied to the criminal defendant's actions in that case. We held that two offenses arise out of the "same act or transaction" if they are so closely connected in time, place, and circumstance that a complete account of one charge cannot be related without relating details of the other charge. *Id. See State* v. *Fitzgerald*, 267 Or. 266, 273, 516 P.2d 1280, 1284 (1973). In the present case, four murders were committed at the same place, under the same circumstances, within a narrow time span. We hold that Code § 18.2-31(g) was constitutional.

## C

 Buchanan also argues that the statutory provision concerning vileness is unconstitutional under the Eighth Amendment because it encompasses a "far greater range of conduct than" it excludes; thus, he contends, it fails to ensure that "the death penalty only be imposed for conduct which is qualitatively different from conduct in a non-capital murder." We have already considered and rejected this argument. *Turner* v. *Commonwealth*, 234 Va.

543, 552, 364 S.E.2d 483, 488, *cert. denied*, 486 U.S. 1017 (1988); *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979). We adhere to our previous rulings.[5]

## VII. CHALLENGES TO THE GUILT PHASE VERDICT

### A. *Discrepancy Between The Indictment and the Jury's Verdict*

 Buchanan complains that there is a discrepancy between the indictments and the jury's verdicts because the jury found him guilty of the capital murder of each of the victims instead of finding him guilty of only one capital murder. Buchanan did not object to the jury's verdict on this basis.[6] Thus, we will not consider this issue. Rule 5:25.

### B. *Double Jeopardy Violation*

 Buchanan contends that the jury's verdict violated his Fifth Amendment right to be free of multiple punishments for the same offense. He argues that since he killed four people and was tried and convicted of four first degree murders, his additional conviction of capital murder subjected him to multiple punishments for the same offense because first degree murder is a lesser included offense of capital murder. And, he argues, a conviction of a lesser included offense constitutes acquittal of all higher offenses. In oral argument, Buchanan approached the issue from the other direction; he submitted that because the jury returned a verdict of four capital murder convictions, the jury could not convict him of four first degree murders. On brief, Buchanan argues that because the capital murder convictions and the first degree murder convictions were based on the same facts, the first degree murder convictions should stand and the capital murder convictions should be dismissed.

The Commonwealth argues that two basic principles refute Buchanan's concern about a Fifth Amendment multiple punish-

---

[5] Included within this constitutional attack on the vileness test is an argument, advanced for the first time on this appeal, that the trial court should have ruled, as a matter of law, that the killings of Buchanan, Sr. and Donnie were not vile. Rule 5:25.

[6] Defendant moved to set aside the "conviction of capital murder as contrary to the law and to the evidence on the ground that based on the evidence in this case and the law, that the jury should not have found that all four killings were part of the same transaction."

ment violation. The first principle is that where a defendant is convicted of more than is charged in the indictment, the excess convictions must be set aside and the related sentences vacated. *See Morris* v. *Commonwealth*, 228 Va. 206, 209, 321 S.E.2d 633, 634-35 (1984). The second principle is that where, in a single trial, a defendant is convicted of a lesser included offense and the greater offense, the proper remedy is to vacate both the conviction and sentence of the lesser included offense while leaving in place the conviction and sentence on the greater offense. *Brown* v. *Commonwealth*, 222 Va. 111, 116, 279 S.E.2d 142, 145 (1981). *See United States* v. *Buckley*, 586 F.2d 498, 505 (5th Cir. 1978), *cert. denied*, 440 U.S. 982 (1979). We agree with the Commonwealth.

 The only indictment on which the jury was instructed was the first indictment wherein Buchanan was charged with killing Buchanan, Sr. as part of the same act or transaction in which he killed J.J., Donnie, *or* Mrs. Buchanan. Under this indictment, the jury could convict Buchanan of only one capital murder, but the indictment gave the jury seven choices as to which victims were killed as part of the same act or transaction. The jury found that Buchanan killed all four victims as part of the same act or transaction. However, the jury then went on to find Buchanan guilty of the capital murders of each of the four victims. This second part of the verdict was, under the indictment on which the jury was instructed, beyond the jury's power. Given the way the indictment was framed, the only capital murder which the jury could find was that of Buchanan, Sr. Under the rule of *Morris*, the other capital murder convictions were subject to being set aside. The trial court has already made that ruling and it was correct.

This leaves Buchanan with convictions for the capital murder of Buchanan, Sr., as well as the first degree murders of Buchanan, Sr., J.J., Donnie, and Mrs. Buchanan. In short, Buchanan was left with five murder convictions when he killed four people. This result is, as the Commonwealth concedes, incorrect. The problem, as the Commonwealth describes it, is one too many first degree murder convictions.

 The remedy is uncomplicated. Under the rule in *Brown*, Buchanan's first degree murder conviction for killing his father must be vacated along with the related sentence.[7]

---

[7] The trial court's view that *Fitzgerald* v. *Commonwealth*, 223 Va. 615, 637, 292 S.E.2d 798, 810-11 (1982), supports the five convictions is incorrect. In *Fitzgerald*, a capital murder-robbery case, we held that the defendant could be convicted of capital murder for the

## VIII. MISCELLANEOUS

### A

█ Buchanan claims the trial court erred by not allowing his court-appointed psychiatrist to visit the scene of the crime with Buchanan and Buchanan's counsel. However, at trial, when the trial court ruled that Buchanan could visit the scene with defense counsel (with defendant under the supervision and control of the sheriff's department), Buchanan agreed: "If he [the psychiatrist] can't go, then he can wait for us and when we come back he can talk to Mr. Buchanan and talk to us. *That would be fine.*" (Emphasis added.) Rule 5:25.

### B

█ Buchanan argues that the trial court erred in refusing to allow two of his expert witnesses to testify in the penalty phase of the trial about out-of-court interviews and discussions they had had in arriving at their expert opinion concerning Buchanan's state of mind at the time of the murders and the need for further neurological testing. Buchanan urges us to apply the expert testimony rule that applies in civil cases, Code § 8.01-401.1.

The trial court excluded testimony of the hearsay information on the ground that experts in criminal cases must testify on the basis of their own personal observations or on the basis of evidence adduced at trial. The trial court was plainly correct. We decided the issue in *Simpson* v. *Commonwealth*, 227 Va. 557, 318 S.E.2d 386 (1984). We adhere to our previous ruling.

### C

█ Buchanan submits that it was error to list the statutory aggravating factors for the jury while refusing to list the mitigating factors mentioned in the statute. Even in advancing this argument, Buchanan admits that it is contrary to *Watkins* v. *Commonwealth*, 229 Va. 469, 331 S.E.2d 422 (1985), *cert. denied*, 475 U.S. 1099 (1986). Yet he asks us to reconsider *Watkins*. We decline the invitation. The rule that the mitigating factors mentioned in the statute must not be listed is intended to benefit the

killing and also be convicted separately of the robbery. In order for *Fitzgerald* to support the five convictions which occurred in the instant appeal, we would have had to rule that Fitzgerald could have been convicted of capital murder, first degree murder, and robbery.

defendant. If the factors suggested in the statute were listed, the jury could be misled into concluding that those were the only factors it could consider in mitigation. But the intent of the statute is to leave the jury free to consider, in mitigation, whatever the jury deems appropriate. *Watkins*, 229 Va. at 491, 331 S.E.2d at 438; *Clark*, 220 Va. at 212, 257 S.E.2d at 790.

## D

■ Buchanan argues that the trial court erred by refusing to advise the jury regarding consecutive sentences and the possibility of parole. There was no error in this ruling. We have held that a jury must impose the sentence it deems appropriate without regard to what will happen later. *See Poyner* v. *Commonwealth*, 229 Va. 401, 418-19, 329 S.E.2d 815, 828, *cert. denied*, 474 U.S. 865 and 474 U.S. 888 (1985).

## E

Buchanan argues here for the first time that penalty phase instruction 1-P should not have been granted. Yet, at trial, defense counsel said there was "no objection" to the instruction. Rule 5:25.

## F

■ Buchanan submits that the trial court erred in refusing to allow him to secure additional neurological testing in an effort to develop evidence in mitigation. Buchanan sought to establish that his brain had suffered temporal lobe damage.

Prior to trial, Buchanan was examined at the University of Virginia. Those examinations included a complete neurological examination, an E.E.G., and an M.R.I. (magnetic resonance imaging). All tests were negative. When he was examined at the University of Virginia, the doctors there were looking for, but did not find, the same type brain damage that Buchanan hoped to find with a new series of tests. At a hearing on the motion, the evidence showed that even if temporal lobe damage is found, the authorities are split over the question whether that problem has any relationship to violent conduct. Buchanan had one complete neurological examination and had no right to another. *Cf. Beaver* v. *Commonwealth*, 232 Va. 521, 528, 352 S.E.2d 342, 346, *cert. denied*, 483

U.S. 1033 (1987). In our opinion, the trial court did not abuse its discretion in denying the motion.

## IX. STATUTORY REVIEW

■ Our independent review of the record reveals nothing to suggest that the death penalty was imposed in this case as the result of passion, prejudice, or arbitrariness. The evidence of guilt was fully sufficient. This same evidence was relied upon in the penalty phase and was ample to support the death penalty. We hold that this death sentence was not imposed arbitrarily or on the basis of passion or prejudice.

■ Defendant does not argue, and we find no evidence, that this death sentence was excessive or disproportionate. We have accumulated death penalty cases involving Code § 18.2-31(g), and other death penalty cases involving death by gunshot where the death penalty was based on vileness, and we conclude that juries in Virginia customarily impose the death sentence in cases of this kind. *See, e.g., Turner* v. *Commonwealth*, 234 Va. 543, 364 S.E.2d 483 (1988); *Barnes* v. *Commonwealth*, 234 Va. 130, 360 S.E.2d 196 (1987), *cert. denied*, 484 U.S. 1036 (1988); *Jones* v. *Commonwealth*, 228 Va. 427, 323 S.E.2d 554 (1984); *Bunch* v. *Commonwealth*, 225 Va. 423, 304 S.E.2d 271 (1983); *Justus* v. *Commonwealth*, 222 Va. 667, 283 S.E.2d 905 (1981).

## X. CONCLUSION

We hold that Buchanan's first degree murder conviction, for killing Buchanan, Sr. will be set aside and that the trial court's judgment will be affirmed as to the capital murder conviction, the remaining first degree murder convictions, and the firearm convictions.

Record No. 890107 — *Affirmed.*
Record No. 890108 — *Modified and Affirmed.*