PRESENT:  All the Justices

BENJAMIN LEE LILLY

                                        OPINION BY
v.  Record Nos. 972385, 972386  JUSTICE LAWRENCE L. KOONTZ, JR.
                                      April 17, 1998
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
                      Ray W. Grubbs, Judge

     In this appeal, we review the capital murder conviction and

death sentence imposed by a jury on Benjamin Lee Lilly (Lilly).

Lilly was also convicted of lesser offenses arising out of the

same occurrence, but does not directly challenge the sufficiency

of the evidence to support his convictions for the lesser

offenses.

**I.**
**PROCEEDINGS**

     On April 1, 1996, indictments were returned against Lilly

charging that on December 5, 1995, Lilly abducted and robbed

Alexander V. DeFilippis, Code §§ 18.2-47 and 18.2-58, carjacked

DeFilippis' vehicle, Code § 18.2-58.1, and subsequently murdered

DeFilippis as part of the commission of the robbery, Code §

18.2-31(4).  Lilly was also charged with use of a firearm in the

principal offenses and for possession of a firearm after having

previously been convicted of a felony.  Code §§ 18.2-53.1 and

18.2-308.2(A)(i).

Lilly filed pre-trial motions to exclude evidence of a statement he made to Pearisburg Police Chief William Whitsett, to permit voir dire of jurors concerning parole ineligibility issues,[1] to exclude evidence of Lilly's refusal to submit to a paraffin gunpowder residue test, and for a bill of particulars. Lilly also sought to exclude from evidence statements made by Mark Lilly, Lilly's brother and a co-participant in these crimes, asserting that their admission would be a violation of the hearsay rule and of the confrontation clause. The trial court denied all of these motions. Lilly also filed a motion for a change of venue, which the trial court took under advisement pending selection of the jury.

Lilly also filed a discovery request seeking, inter alia, "[a]ll alleged confessions or statements of any kind made by the Defendant or any alleged co-conspirator . . . in every media in which each such confession or statement may exist." The trial court granted the discovery motion and the Commonwealth supplied Lilly with, among other items, transcripts of the tape-recorded statements of Mark Lilly.

Jury selection began on October 15, 1996 and continued over four days. Trial commenced on October 21, 1996 and proceeded

---

[1] In addition, Lilly sought to argue parole ineligibility as a mitigating factor and to submit jury instructions on this issue during the penalty phase. The trial court granted these portions of the motion.

for five days, concluding with a jury verdict finding Lilly guilty on all counts of the indictments. The penalty phase of the trial occurred on October 28, 1996, concluding with a jury recommendation of a sentence of death for the capital murder charge and two life terms plus a total of 27 years for the lesser offenses. The trial court entered judgment on the jury's verdict and imposed the sentences by final order dated March 7, 1997.

## II.
## EVIDENCE

We will review the evidence in the light most favorable to the Commonwealth. Clagett v. Commonwealth, 252 Va. 79, 84, 472 S.E.2d 263, 265, cert. denied, ___ U.S. ___, 117 S.Ct. 972 (1996). Gary Wayne Barker, the Commonwealth's principal witness, shared a room with Mark Lilly. Barker testified that on the day before the murder, he, Lilly, and Mark Lilly were at Lilly's home "drinking" and smoking marijuana. Later, the three men drove to a friend's house to "drink a little bit with him." When they discovered that the friend was not at home, the three men broke into the house and stole several guns, a safe, and a quantity of liquor. They subsequently broke open the safe and divided its contents.

The three men then drove to Radford where they tried unsuccessfully to trade the stolen guns for marijuana. They

3

then went to stay at the home of an acquaintance in Blacksburg. During this time they continued to drink and smoke marijuana.

The following morning, the three men drove over the back roads in the vicinity of Shawsville and Elliston, stopping to fire the stolen guns at some geese and killing one, which they put in the trunk of the car. They again attempted to trade the guns for marijuana at a trailer park and a bar in Blacksburg.

Near Heathwood, the car in which the three men were travelling broke down in the vicinity of a convenience store. They removed the liquor and guns from the car. DeFilippis, who had driven to the store with a friend, was inspecting a tire on his vehicle while his friend went into the store. Lilly, carrying one of the stolen guns, confronted DeFilippis and called for Barker and Mark Lilly to join him. Lilly ordered DeFilippis into DeFilippis' car and Mark Lilly and Barker also got into the vehicle. Lilly then drove the vehicle away from the store and ordered DeFilippis to surrender his wallet.

Lilly drove DeFilippis' car to an isolated point on the bank of the New River near Whitethorne, stopped the car, and ordered DeFilippis to get out. Mark Lilly was carrying one of the stolen guns, a pistol. The other guns were left in the car. Lilly ordered DeFilippis to strip to his underwear and walk away from the car. After throwing DeFilippis' clothing into the river, the three men returned to the car. Lilly took the pistol

4

from Mark Lilly, ran up to DeFilippis, turned him around, and shot him four times, fatally striking him three times in the head and once in the arm.

Lilly returned to the car, leaving DeFilippis' body in the road. Barker and Mark Lilly asked Lilly why he had shot DeFilippis. He replied that DeFilippis had seen Lilly's face and that "I ain't going back" to the penitentiary.

The three men bought beer with the money they had stolen from DeFilippis and then drove to the McCoy River where they disposed of "anything that might have our prints on it," although they retained the murder weapon and the other guns. They then drove to "a little market" in Giles County, where they robbed the owners of cash and some merchandise.

Determining that the money from this robbery was not sufficient "[t]o get us out of . . . town," they drove to another store, also in Giles County. Barker and Mark Lilly entered that store and attempted to rob the clerk. They were interrupted by the owner who grabbed Barker. Barker broke free and the two men fled to the car. The owner followed them as Lilly drove away. Barker fired one of the guns into the air to let the owner know that they were armed, and he ended his pursuit.

A short time later, the car broke down. As the three men were removing the stolen merchandise from the car, police

5

officers arrived. The three men fled on foot, with Barker and Lilly being captured almost immediately.

One of the officers responding to the report of these robberies was Police Chief Whitsett. While Lilly was sitting in a police car and Whitsett was standing nearby, Lilly asked Whitsett to place his shotgun in Lilly's mouth and pull the trigger. Whitsett refused and asked Lilly "if I looked like a murderer?" In reply to a comment made by Lilly, Whitsett then asked, "what does a murderer look like anyway?" Lilly replied, "me."

Barker and Mark Lilly both told the police about the DeFilippis murder in their statements. In his initial statement to police, Lilly did not mention the murder and maintained that the other two men had forced him to participate in the robberies.

We will recite other relevant facts and proceedings within the discussion of the assignments of error.

### III.
### ISSUES PREVIOUSLY DECIDED

Lilly has assigned error to the trial court's failure to order the Commonwealth to provide a general bill of particulars prior to trial, as well as a bill of particulars of the aggravating factors upon which the Commonwealth would rely during the penalty phase of the trial. Lilly has further

assigned error to the trial court's finding that the Virginia death penalty statute is not unconstitutional. The arguments raised in these assignments of error have been thoroughly addressed and rejected in numerous prior capital murder cases. We find no reason to modify our previously expressed views on these issues. Clagett, 252 Va. at 85-86, 472 S.E.2d at 266-67.

## IV.
## JURY SELECTION

Lilly assigns error to the trial court's refusal to allow him to depart from the trial court's approved list of questions during voir dire. The record shows that the trial court and counsel for the defense and the Commonwealth conferred extensively in advance of the voir dire concerning the questions to be asked of potential jurors. Lilly has failed to identify any question he was not allowed to ask or to show that any potential juror was not fully questioned. A party must have a full and fair opportunity to examine the venire, but the trial court retains discretion to determine when a defendant has had such an opportunity. Buchanan v. Commonwealth, 238 Va. 389, 401, 384 S.E.2d 757, 764 (1989), cert. denied, 493 U.S. 1063 (1990). Lilly has failed to demonstrate that he was in any way prejudiced by the trial court's limiting of the questions which could be put to prospective jurors, and we will not disturb the trial court's determination in this matter. Id.

7

Lilly further asserts that the trial court erred in refusing to permit him to "educate" the jurors on the issue of parole ineligibility of defendants upon whom life sentences are imposed in capital murder cases. He contends that the requirement of Simmons v. South Carolina, 512 U.S. 154, 162 (1994), that the trial court instruct the jury on parole ineligibility requires that the venire be informed on this issue at the outset of trial and that individual jurors may be questioned on their views of this issue. We disagree.

The clear import of Simmons is that, once a defendant is convicted of a capital crime, he has, as a matter of due process, the right to have the jury informed of his ineligibility for parole in order that this factor may be weighed by the jury against the finding of his further dangerousness to society. Nothing in Simmons even remotely suggests that knowledge of parole ineligibility rules and exploration of potential jurors' opinions on that subject would be a proper topic for voir dire.[2] The probable confusion and prejudice such an inquiry would cause in the minds of jurors is self-evident. Accordingly, we reject Lilly's contention that he

---

[2]The record reflects that the jury was properly instructed on parole ineligibility during the penalty phase of the trial and that Lilly was permitted to argue that his parole ineligible status militated in favor of a life sentence.

should have been permitted to "educate" and examine the venire on this issue.

Lilly assigns error to the trial court's dismissal for cause of six members of the venire. Each of the prospective jurors expressed strong moral or religious reservations about her ability to impose a sentence of death. Three of the jurors, Connie Huffman, Kristina Mitchell, and Ollie Jones, ultimately agreed, but with some continuing equivocation, that they could follow the trial court's instructions.

In asserting that these jurors should not have been excused, Lilly confines his argument to a discrete portion of the examination of each of them. We must consider the voir dire as a whole, not just isolated statements. Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988), cert. denied, 492 U.S. 925 (1989).

The trial court's decision whether to strike a prospective juror for cause is a matter submitted to its sound discretion and will not be disturbed on appeal unless it appears from the record that the trial court's action constitutes manifest error. Stockton v. Commonwealth, 241 Va. 192, 200, 402 S.E.2d 196, 200, cert. denied, 502 U.S. 902 (1991). In the present case, the trial court had the opportunity to observe each juror's demeanor when evaluating the juror's responses to the questions of counsel and the questions of the trial court. Nothing in the

9

record suggests that the trial court abused its discretion in striking these jurors from the venire for cause despite the attempts of the defense to rehabilitate them.

The trial court found that the other three prospective jurors, Ann Mumaw, Leona Wallace, and Janet Matheson, were adamant in their personal opposition to capital punishment and could not impose a death sentence.  Lilly contends that by excluding them from the venire, he was denied the opportunity of having a jury of his peers.  Where a juror has clearly indicated that she will be unable to follow the trial court's instructions and consider all the available penalties that might be imposed, it is appropriate for the trial court to excuse the juror for cause.  Gray v. Commonwealth, 233 Va. 313, 334, 356 S.E.2d 157, 168, cert. denied, 484 U.S. 873 (1987).  The elimination of such jurors from the venire "does not violate the right of a defendant in a capital case to be tried by an impartial jury selected from a representative cross-section of the community." Id. at 335, 356 S.E.2d at 169; see also Poyner v. Commonwealth, 229 Va. 401, 413-14, 329 S.E.2d 815, 825 (1985).

Lilly assigns error to the retention of three members of the venire over his motion that they be excused for cause. James Rakes stated during voir dire that he was acquainted with Chief Whitsett and that he might give more credence to Whitsett's testimony as a result.  Upon further examination,

10

Rakes stated that he could set aside his acquaintance with Whitsett and consider the testimony of all the witnesses on an equal plane.

Samuel Shumate stated during voir dire that he was a second cousin and "real good friend" of Investigator Ron Hamblin, a prospective witness for the Commonwealth. Shumate testified that his relationship and friendship with Hamblin would not be a factor in considering Hamblin's testimony against that of other witnesses.

Lilly also asserts that an unidentified juror was permitted to remain on the jury panel after having "read a newspaper article about Mr. Lilly's past." Lilly initially objected to the seating of any juror who had been exposed to specific newspaper articles, and this assignment of error apparently relates to a member of the venire who had read one of the articles and was actually seated on the final jury panel. In addressing the issue immediately prior to trial, the trial court reiterated that it accepted the juror's testimony that the article had not prejudiced her.

As noted above, the decision to retain or excuse a juror rests within the sound discretion of the trial court. Here, the trial court had the opportunity to observe these three jurors and evaluate their responses to the questions put to them. Nothing in the record suggests that the refusal to strike these

11

jurors constitutes manifest error by the trial court, and we will not disturb the trial court's exercise of its discretion in these instances.  Stockton, supra.

Lilly further maintains that juror Shumate should have been excused on the ground that Shumate was related to a "party" to the suit.[3]  Code § 8.01-358; Rule 3A:14(1).  With respect to the application of this rule in criminal cases, we have held that, even though the victim is not a party to the proceeding, a person is disqualified from serving as a juror if he is related to the victim.  Jaques v. Commonwealth, 51 Va. (10 Gratt.) 690, 695 (1853); see also Gray v. Commonwealth, 226 Va. 591, 593-94, 311 S.E.2d 409, 410 (1984).

Lilly asserts that Investigator Hamblin is a "party" to this criminal proceeding.  Lilly apparently bases this assertion on the fact that this officer's role in the investigation of the crimes in question was significant to the prosecution's case.  Although we have not previously addressed this issue, we hold

---

[3]The Commonwealth asserts that Lilly did not raise this issue below and should be barred from raising it for the first time on appeal.  Rule 5:25.  However, in noting his objection to the trial court's retention of Shumate, Lilly's counsel stated, "This is a relative and this is a friend."  "It is the duty of the trial court, through the legal machinery provided for that purpose, to procure an impartial jury to try every case." Salina v. Commonwealth, 217 Va. 92, 93, 225 S.E.2d 199, 200 (1976).  The objection noted the family relationship and was sufficiently clear to raise the issue of whether the juror could "stand indifferent to the cause."  Code § 8.01-358.

that when the officer's sole role in a criminal prosecution is as a witness, he is not a "party" within the meaning of Code § 8.01-358 and Rule 3A:14(1). Thus, a juror's relationship to such a police officer-witness does not require per se dismissal of that juror from the venire, and the juror may be retained if the trial court is satisfied that the juror can set aside considerations of the relationship and evaluate all the evidence fairly. See State v. Lee, 559 So. 2d 1310, 1317 (La. 1990); State v. Hunt, 558 A.2d 1259, 1267-68 (N.J. 1989); Arner v. State, 872 P.2d 100, 104 (Wyo. 1994).

## V.
## VENUE

After the jury panel was selected, the trial court, which had deferred consideration of the motion, denied Lilly's motion for a change of venue made on the theory that pre-trial publicity had potentially prejudiced the members of the venire. The trial court noted that the selection of the jury panel had not proved difficult, with fewer than half of the jurors stating that they had heard or read about the case, and with none showing particular bias as a result of the pre-trial publicity. Lilly asserts that the trial court erred in not granting the change of venue. We disagree.

A presumption exists that the defendant will receive a fair trial in the jurisdiction in which the offense occurred.

13

Stockton, 227 Va. at 137, 314 S.E.2d at 379-80.  In order to overcome that presumption, the defendant must demonstrate that the citizens of the jurisdiction feel such prejudice against him that it is reasonably certain he cannot receive a fair trial. Id.  Accordingly, the decision whether to grant a change of venue lies within the sound discretion of the trial court. George v. Commonwealth, 242 Va. 264, 274, 411 S.E.2d 12, 18 (1991), cert. denied, 503 U.S. 973 (1992).

The fact that there have been media reports about the accused and the crime does not necessarily require a change of venue.  Buchanan, 238 Va. at 407, 384 S.E.2d at 767-68.  The trial court should consider "the difficulty encountered in selecting a jury" as a significant factor in determining whether actual prejudice has resulted from the publicity.  Mueller v. Commonwealth, 244 Va. 386, 398, 422 S.E.2d 380, 388 (1992), cert. denied, 507 U.S. 1043 (1993).  The record here adequately reflects that the trial court acted well within its sound discretion in denying a change of venue in light of the ease with which a qualified jury panel was selected.

## VI.
## GUILT PHASE

### A. Commonwealth's Use of Photographs and Videotape

During its opening statement, the Commonwealth displayed an enlarged "in life" photograph of the victim to the jury.  At the

14

conclusion of that opening statement, Lilly made a motion for a mistrial, asserting that the photograph showing the victim alive was inherently prejudicial because it tended to invoke sympathy for the victim. The trial court found that there was no prejudice to the defendant as a result of the use of the photograph and overruled the motion, but directed that the Commonwealth remove the photograph from further display. Lilly assigns error to the trial court's failure to grant a mistrial.

Lilly cites no authority for the proposition that photographs of the victim taken before his death are inherently prejudicial, an issue not previously addressed in this Commonwealth. Those jurisdictions that have considered the issue have held that there is no inherent prejudice in the use of in life photographs of the victim, especially where the jury will also view crime scene photographs showing the victim. See, e.g., State v. Broberg, 677 A.2d 602, 610 (Md. 1996). Thus, the use of in life photographs is a matter committed to the discretion of the trial court unless clearly prejudicial. Id.; State v. Brett, 892 P.2d 29, 41 (Wash. 1995); cf. Commonwealth v. Story, 383 A.2d 155, 158 (Pa. 1978)(in life photographs of victim with his handicapped daughter were prejudicial). We hold that it was within the sound discretion of the trial court to determine that Lilly was not prejudiced by the limited display

15

of the in life photograph of the victim, and we find no abuse of that discretion in this instance.

Lilly assigns error to the admission of certain other photographs and the trial court's denial of his request that black-and-white photographs be substituted for color photographs.  These photographs depicted the crime scene of the murder, including graphic images of the victim.

A graphic photograph is admissible so long as it is relevant and accurately portrays the scene of the crime.  Clozza v. Commonwealth, 228 Va. 124, 135, 321 S.E.2d 273, 280 (1984), cert. denied, 469 U.S. 1230 (1985).  The admission into evidence of photographs of the body of a murder victim is left to the sound discretion of the trial court and will be disturbed only upon a showing of a clear abuse of discretion.  Williams v. Commonwealth, 234 Va. 168, 177, 360 S.E.2d 361, 367 (1987), cert. denied, 484 U.S. 1020 (1988).

The record shows that the trial court reviewed the photographs proffered as potential exhibits by the Commonwealth and excluded the autopsy photographs, which it found excessively graphic.  We find no abuse of discretion in the admission of the crime scene photographs, since these accurately depicted the scene of the crime.  Similarly, it was within the sound discretion of the trial court to determine whether the probative

value of color photographs outweighed the potential prejudice of their content.

Lilly also assigns error to the admission of a videotape of the crime scene of the murder. Videotapes showing the crime scene and the victim are admissible to show motive, intent, method, malice, premeditation, and the atrociousness of the crime. Spencer v. Commonwealth, 238 Va. 295, 312, 384 S.E.2d 785, 796 (1989), cert. denied, 493 U.S. 1093 (1990); Stamper v. Commonwealth, 220 Va. 260, 270-71, 257 S.E.2d 808, 816 (1979), cert. denied, 445 U.S. 972 (1980). If the videotape accurately depicts the crime scene, it is not rendered inadmissible simply because it is gruesome or shocking. Goins v. Commonwealth, 251 Va. 442, 459, 470 S.E.2d 114, 126, cert. denied, 519 U.S. ___, 117 S.Ct. 222 (1996). As with other photographic evidence, the admission of a crime scene videotape rests within the sound discretion of the trial court, and the trial court's decision will not be reversed on appeal absent a showing of abuse of that discretion. Id. We find no abuse of discretion in the admission of crime scene videotape here.

B. Admission of Mark Lilly's Statement

At trial, Mark Lilly was called as a witness for the Commonwealth, but invoked his right against self-incrimination under the Fifth Amendment. Asserting that Mark Lilly was unavailable as a witness, the Commonwealth sought to introduce

17

his pre-trial statements to police as declarations against his penal interest. Lilly objected on the ground that these statements did not fall within this hearsay exception because they were self-serving and tended to exculpate Mark Lilly by shifting responsibility to Lilly and Barker for the majority of the criminal acts the three men committed.

In his statements, Mark Lilly contended that he stole only liquor during the breaking and entering of the house of Lilly's friend, but that Lilly and Barker "got some guns or something." He further directly implicated Lilly as the instigator of the carjacking, saying that Lilly "wanted to get him another car." In the statements, Mark Lilly directly implicated Lilly as the triggerman in the murder and asserted that he and Barker "didn't have nothing to do with the shooting [of DeFilippis]."

To be admissible as a declaration against penal interest, an out-of-court statement must be made by an unavailable declarant. Ellison v. Commonwealth, 219 Va. 404, 408, 247 S.E.2d 685, 688 (1978). "The law is firmly established in Virginia that a declarant is unavailable if the declarant invokes the Fifth Amendment privilege to remain silent." Boney v. Commonwealth, 16 Va. App. 638, 643, 432 S.E.2d 7, 10 (1993); see also Newberry v. Commonwealth, 191 Va. 445, 462, 61 S.E.2d 318, 326 (1950).

18

To be considered as being against the declarant's penal interest, it is not necessary that the statement be sufficient on its own to charge and convict the declarant of the crimes detailed therein. Chandler v. Commonwealth, 249 Va. 270, 278-79, 455 S.E.2d 219, 224-25, cert. denied, 516 U.S. 889 (1995). Rather, the statement's admissibility is based upon the subjective belief of the declarant that he is making admissions against his penal interest and upon other evidence tending to show that the statement is reliable. Id.

Lilly concedes that statements of a declarant unavailable at trial are admissible if they qualify under the exception to the rule for declarations against penal interest. He asserts, however, that prior to Chandler, this exception was used only to permit the introduction of exculpatory evidence proffered by the defendant. In Lilly's view, Chandler improperly enlarged the exception to permit the Commonwealth to introduce statements of a co-participant which, though nominally against penal interest, actually seek to limit the declarant's culpability by implicating others, and, thus, are inherently unreliable. Accordingly, Lilly urges that Chandler was wrongly decided and should be overturned. We disagree.

We recognize that Ellison, Newberry, and other cases that applied this hearsay exception prior to Chandler involved the admission of such statements proffered by defendants for their

19

exculpatory value.  However, as we said in <u>Ellison</u>, the admission of such statements

> must be left to the sound discretion of the trial court, <u>to be determined upon the facts and circumstances of each case</u>.  But, in any case, once it is established that a third-party confession has been made, the crucial issue is whether the content of the confession is trustworthy.  And determination of this issue turns upon whether, in the words of <u>Hines</u> [<u>v. Commonwealth</u>, 136 Va. 728, 748, 117 S.E. 843, 849 (1923)], the case is one where "there is anything substantial other than the bare confession to connect the declarant with the crime."

219 Va. at 408-09, 247 S.E.2d at 688 (emphasis added).

Thus, in determining the admissibility of a statement against penal interest made by an unavailable declarant, whether offered by the Commonwealth or the defendant, the crucial issue to be resolved by the trial court is the reliability of the statement in the context of the facts and circumstances under which it was given.  Here, the record clearly shows that Mark Lilly was cognizant of the import of his statements and that he was implicating himself as a participant in numerous crimes for which he could be charged, convicted, and punished.  Elements of Mark Lilly's statements were independently corroborated by Barker's testimony, by the physical evidence, and by the correspondence between Mark Lilly's account and the accounts of other persons acquired by law enforcement authorities.  Thus, the statements were clothed in the necessary indicia of reliability to overcome the hearsay bar, and their admission

20

rested well within the trial court's sound discretion.  That Mark Lilly's statements were self-serving, in that they tended to shift principal responsibility to others or to offer claims of mitigating circumstances, goes to the weight the jury could assign to them and not to their admissibility.

Lilly further asserts that the admission of Mark Lilly's statements violated his right of confrontation since he was denied the right to cross-examine the declarant.  We disagree.

The right of confrontation is not absolute.  A statement sufficiently clothed with indicia of reliability is properly placed before a jury even though there is no confrontation with the declarant.  <u>Dutton v. Evans</u>, 400 U.S. 74, 89 (1970).

> [W]here proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied.
>
> . . . .
>
> To exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has as a basic purpose the promotion of the "'integrity of the factfinding process.'"  . . .  [A] statement that qualifies for admission under a "firmly rooted" hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability.

<u>White v. Illinois</u>, 502 U.S. 346, 356-57 (1992)(citations omitted).  As noted above, admissibility into evidence of the statement against penal interest of an unavailable witness is a

21

"firmly rooted" exception to the hearsay rule in Virginia. Thus, we hold that the trial court did not err in admitting Mark Lilly's statements into evidence.[4]  See Randolph v. Commonwealth, 24 Va. App. 345, 353, 482 S.E.2d 101, 105 (1997); Raia v. Commonwealth, 23 Va. App. 546, 552, 478 S.E.2d 328, 331 (1996).

Lilly further asserts that the Commonwealth was permitted to play tape recordings of Mark Lilly's statements to the jury, whereas it had only supplied Lilly with transcripts of those statements in response to Lilly's discovery request.  The record reflects that the trial court offered defense counsel the opportunity to review the recordings before they were played to the jury.  Assuming, without deciding, that the discovery motion and subsequent order of the trial court required disclosure of duplicate tapes rather than transcripts, we hold that Lilly was not prejudiced by the failure of the Commonwealth to do so. Having been supplied with accurate transcripts of the tape recordings prior to trial and having had an adequate opportunity to review them before they were played to the jury, there is no reasonable probability that the proceeding would have been different had duplicates of the tapes been provided to Lilly

---

[4]Lilly further argues that he was unfairly prejudiced by the comments of the police contained within Mark Lilly's statements which he contends placed emphasis on Mark Lilly's truthfulness. However, the record shows that the officers merely encouraged Mark Lilly to tell them the truth.

prior to trial.  See United States v. Bagley, 473 U.S. 667, 682 (1985); Robinson v. Commonwealth, 231 Va. 142, 151, 341 S.E.2d 159, 164 (1986); Briley v. Commonwealth, 221 Va. 563, 576, 273 S.E.2d 57, 65 (1980).

C. Admission of Lilly's Statement to Chief Whitsett

Lilly assigns error to the admission of Chief Whitsett's testimony that Lilly said "me" when Whitsett asked Lilly "what does a murderer look like anyway?"  Lilly asserts that Whitsett's conversation with him constituted a custodial interrogation prior to Lilly's having been informed of his right to counsel and his right against self-incrimination.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment."  Miranda v. Arizona, 384 U.S. 436, 478 (1966). Lilly's statement was clearly not the result of a custodial interrogation in that he initiated the conversation and the statement was voluntary.  We hold, therefore, that the trial court did not err in permitting this statement into evidence. Massie v. Commonwealth, 211 Va. 429, 431-32, 177 S.E.2d 615, 617 (1970).

Lilly further asserts that Whitsett's testimony was unreliable since in preliminary testimony Whitsett testified only that he "thought" Lilly had said "me."  Whitsett testified

23

at trial that he was certain of what Lilly said.  Lilly was not prohibited from cross-examining Whitsett concerning his certainty as to the statement.  Thus, it was a matter for the jury to weigh and determine.  Johnson v. Commonwealth, 224 Va. 525, 528, 298 S.E.2d 99, 101 (1982).

D. Miscellaneous Evidentiary Rulings

Over Lilly's objection, Lieutenant Gary Price of the Giles County Sheriff's Office was permitted to testify that Lilly declined to submit to a gunpowder residue test and then began rubbing his hands together.  Price testified that since he believed a gunpowder residue test constituted a search requiring a warrant or the consent of the suspect, he had informed Lilly that the test was voluntary.  Price further testified that Lilly's rubbing his hands together would get rid of gunpowder residue.

Lilly concedes that he could have been required to take the test.  However, Lilly contends that, because he was told that the test was "voluntary," the evidence of his refusal amounts to a use of a defendant's silence as an admission of guilt.

We will assume, without deciding, that evidence of a defendant's refusal to submit to a gunpowder residue test after having been informed, erroneously, that the test was voluntary, is inadmissible as a violation of the Fifth Amendment right

24

against self-incrimination.[5]  Under the circumstances of this case, however, that error was harmless beyond a reasonable doubt.  The record shows that Lilly fired one or more of the guns taken in the breaking and entering prior to the murder.  Thus, the gunpowder residue test would have been positive for that reason alone, and the jury was aware of that circumstance.  In addition, we hold that Lilly's act of rubbing his hands together in an apparent attempt to destroy any gunpowder residue on his hands was a nonverbal act that went beyond the mere refusal to submit to the test and, as such, was not subject to exclusion under the right against self-incrimination.  Accord Salster v. State, 487 So. 2d 1020, 1021 (Ala. Crim. App. 1986)(defendant's nonverbal conduct in secreting contraband was not constitutionally protected); see also Stevenson v. Commonwealth, 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977)(nonverbal conduct may be treated as an assertion).

Lilly also assigns error to the admission of evidence that dried blood was found on the back of his pant leg.  Lilly contends that the location of the bloodstain was inconsistent

---

[5]See Herring v. State, 501 So. 2d 19, 21 (Fla. Ct. App. 1986)(informing defendant that gunpowder residue test is voluntary permits defendant to refuse test).  But see Wilson v. State, 596 So. 2d 775, 777-78 (Fla. Ct. App. 1992)(criticizing and distinguishing Herring); State v. Odom, 277 S.E.2d 352, 355 (N.C. 1981)(permitting evidence that defendant refused to submit to gunpowder residue test without attorney present).

with its having resulted from the murder because the Commonwealth alleged Lilly was facing the victim at the time Lilly shot the victim. Lilly further asserts that no test was conducted to determine whether the blood was of human origin, and that it is as likely that this blood came from the geese that the men shot earlier in the day. Therefore, he asserts that the trial court abused its discretion in admitting this evidence. We disagree.

The presence of bloodstains on Lilly's clothing was probative, however slightly, of his involvement in the murder. The lack of a scientific determination that the blood was from a human source was a matter of the weight and credibility, if any, of that evidence for the jury to consider. The record does not show that Lilly was prohibited from questioning the Commonwealth's witnesses on this matter. Accordingly, we hold that admission of this evidence was not error.

Lilly objected to the introduction of the medical examiner's report on the ground that it contained references to tests not performed by the proponent of the report. The Commonwealth responds that the trial court excluded from evidence a local medical examiner's report, admitting only the report prepared by the proponent or his staff. To the extent, if any, that the contents of the report admitted fell outside the exception to the hearsay rule provided for medical

26

examiners' reports under Code § 19.2-188, we hold that Lilly has failed to show how any of that material was prejudicial and not merely cumulative of properly admitted evidence, and that in light of the other proof in the record, its admission was harmless beyond a reasonable doubt.  See Fitzgerald v. Commonwealth, 223 Va. 615, 630, 292 S.E.2d 798, 807 (1982), cert. denied, 459 U.S. 1228 (1983).

Lilly assigns error to the trial court's refusal to admit a statement made by Barker to a friend to the effect that Barker would be able to kill his best friend and feel no remorse.  The record reflects, however, that Lilly initially objected to the statement's admission, then later sought its admission over the Commonwealth's objection.  After the Commonwealth subsequently withdrew its objection, the trial court reversed its ruling to exclude the statement, but Lilly failed to recall the witness.  Accordingly, we hold that this issue was not properly preserved for review.

E. Witness Sequestration Issue

Barker, who had not been present when the trial court admonished the other witnesses to refrain from reading or observing media reports about the trial, testified that he had read a newspaper article the morning before he testified.  The trial court reviewed the article and questioned Barker, who testified that nothing in the article affected his testimony.

Lilly assigns error to the trial court's refusal to strike Barker's testimony.

Sequestration of witnesses is not a right, but a power wholly within the discretion of the trial court. Hampton v. Commonwealth, 190 Va. 531, 553-54, 58 S.E.2d 288, 297 (1950). We cannot say that the trial court abused its discretion in refusing to strike the evidence of a witness who was not aware of the sequestration order and testified that the exposure to the newspaper article did not affect his testimony.

F. Jury Instruction Issue

Lilly assigns error to the trial court's refusal to grant his proposed instruction on voluntary intoxication. The facts, however, did not warrant the proposed instruction.

> Generally, voluntary intoxication is not an excuse for any crime. The only exception to this general rule is in cases involving deliberate and premeditated murder. Mere intoxication will not negate premeditation. However, when a person voluntarily becomes so intoxicated that he is incapable of deliberation or premeditation, he cannot commit a class of murder that requires proof of a deliberate and premeditated killing.

Wright v. Commonwealth, 234 Va. 627, 629, 363 S.E.2d 711, 712 (1988)(citations omitted).

Here, Lilly was able to operate an automobile both before and after the murder. During his flight immediately after the murder, he committed robberies to facilitate his continued flight and took steps to deliberately conceal his involvement in

28

the murder.  All of these actions suggest that he was fully in command of his faculties and acted with deliberation.  Nothing in the evidence suggests that he was so intoxicated as to be unable to form the requisite intent to commit premeditated murder.  Accordingly, the trial court properly refused the proffered instruction on voluntary intoxication.

## G. Prosecutorial Misconduct

Lilly assigns error to the trial court's refusal to grant a mistrial after the Commonwealth's Attorney allegedly pointed the murder weapon at Lilly and his counsel during closing argument.  After making a cursory statement that the action of the prosecutor was prejudicial, Lilly addresses the remainder of his argument to the trial court's statement, "[T]hat's ridiculous.  [The gun is] not pointed at you . . . nor is it pointed at anyone in this Courtroom," contending that it was an intentional disparagement of Lilly's counsel.  This argument was not raised below, and may not be raised for the first time on appeal.  Rule 5:25.

## VII.
## PENALTY PHASE ISSUES

Lilly assigns error to the trial court's refusal to grant a penalty phase instruction directing the jury to consider "residual doubt" of guilt in considering the sentence.  We have previously held that such an instruction is inappropriate.

*Stockton*, 241 Va. at 211, 402 S.E.2d at 207. Lilly also sought an instruction directing the jury to "impose the lower grade" of punishment if there was a reasonable doubt as to the grade of punishment to be imposed. The trial court properly ruled that this instruction was both confusing and redundant of an instruction already accepted by the trial court which directed the jury that the Commonwealth was required to present evidence beyond a reasonable doubt of the existence of one or both of the aggravating factors necessary for imposition of the death penalty.

## VIII.
### SENTENCE REVIEW

Under Code § 17-110.1(C)(1) and (2), we are required to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Lilly makes no particularized argument that passion, prejudice, or any other arbitrary factor influenced the jury's decision, and we find nothing in the record that would support such a finding.

In conducting our proportionality review, we must determine "whether other sentencing bodies in this jurisdiction generally

30

impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993). We have examined the records of all capital murder cases reviewed by this Court, including those cases in which a life sentence was imposed. We have given particular attention to those cases in which, as here, the death penalty was based on both the "future dangerousness" and the "vileness" predicates.

Based on this review, we conclude that Lilly's death sentence is not excessive or disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth for comparable crimes. See, e.g., Gray, 233 Va. at 354, 356 S.E.2d at 180; Stout v. Commonwealth, 237 Va. 126, 137, 376 S.E.2d 288, 294, cert. denied, 492 U.S. 925 (1989).

## IX.
## CONCLUSION

We find no reversible error in the judgment of the trial court. Having reviewed Lilly's death sentence pursuant to Code § 17-110.1, we decline to commute the sentence of death. Accordingly, we will affirm the trial court's judgment.

Affirmed.

31