COURT OF APPEALS OF VIRGINIA


Present: Judge Annunziata, Senior Judge Duff and
         Retired Judge Kulp[*]
Argued at Alexandria, Virginia


CALVIN LEE BARRETT
                                    MEMORANDUM OPINION[**] BY
v.   Record No. 1829-99-2      JUDGE ROSEMARIE ANNUNZIATA
                                         MAY 16, 2000
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
                       Edward L. Hogshire, Judge

              Stephen C. Harris for appellant.

              Richard B. Smith, Senior Assistant Attorney
              General (Mark L. Earley, Attorney General,
              on brief), for appellee.


     On June 8, 1999, Calvin Lee Barrett was convicted by a jury

of assaulting a police officer in violation of Code § 18.2-57(C)

and driving after having been adjudicated an habitual offender

(second or subsequent offense) in violation of Code § 46.2-357.

He was sentenced to prison terms of three years and five years,

respectively.  He claims on appeal that the trial court erred in

refusing to grant his motion to strike for cause from the jury

_____

     [*] Retired Judge James E. Kulp took part in the consideration
of this case by designation pursuant to Code § 17.1-400,
recodifying Code § 17-116.01.

     [**] Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

the brother of one of the Commonwealth's witnesses.  For the reasons that follow, we affirm.

## FACTS

On December 17, 1998, Barrett was operating an automobile in the City of Charlottesville.  He was observed by Virginia State Trooper J.S. Fleming, who noted that the vehicle had an expired license tag and a broken left rear taillight lens held in place with duct tape.  Fleming followed Barrett, and turned on the blue strobe lights on top of his police cruiser, but did not sound the siren.  Barrett pulled his vehicle into a small parking lot, opened his door, and began to walk away from the vehicle.  When Fleming "hollered" for Barrett to stop, Barrett continued to move away from the officer.  Fleming followed, took Barrett's arm, and escorted him toward the police cruiser. Barrett broke away from the officer, however, and a series of struggles ensued as Fleming unsuccessfully attempted to arrest Barrett.  Ultimately, as the situation escalated, Fleming drew his service weapon.  Barrett re-entered his vehicle and backed up, hitting Fleming's cruiser before moving forward.  Fleming, having seized Barrett through the window of the car with one arm, held on as the vehicle moved.  When Barrett began to drive the car forward, Fleming shot Barrett in the chest.

Charlottesville Police Officer Charles Wade arrived on the scene after the incident had ended.  Other Charlottesville

police officers were already present, and Officer Wade saw Fleming seated in the rear of a marked Charlottesville police cruiser and Barrett lying on the ground.  He assisted in the investigation of the scene by putting up the yellow "DO NOT ENTER" tape to secure the crime scene, and by examining the area for physical evidence.

Barrett was taken to the University of Virginia Hospital, where he was treated for the gunshot wound.  On December 20, 1998, he was arrested at the hospital on the charges for which he was subsequently convicted.  During voir dire, defense counsel asked a series of questions to prospective juror James Wade.  After establishing that Wade's brother was expected to be one of the Commonwealth's witnesses, he was asked, "if your brother were to take the stand and testify for the Commonwealth, and if my client took the stand and testified, wouldn't it be a natural . . . wouldn't it be natural for you to give your brother's testimony more weight than someone else you didn't know of that was accused of a crime?"  Wade responded, "I'm an impartial person."  In a subsequent query, defense counsel asked, "[W]ouldn't there be a tendency for you, no matter how hard you tried to be impartial, to give your brother, the police officer's testimony at least a little bit more credibility and believability than somebody like my client, Calvin Barrett, who you don't know and who's accused of serious crimes?"  To this

question, Wade answered, "Truthfully, yes." The same question, rephrased, was posed again several times by defense counsel, to which Wade responded, in essence, that he could put aside his relationship with the witness and arrive at a fair and impartial verdict. He explained his earlier answer by stating that, while by "instinct" he would probably tend to favor his brother's testimony, he was certain he could put it aside and be impartial. See Appendix, infra.

Defense counsel's motion to strike Wade for cause was denied.

### ANALYSIS

"Per se rules of disqualification which are based on 'a presumption of [juror] bias or prejudice' are disfavored in Virginia." McGann v. Commonwealth, 15 Va. App. 448, 454, 424 S.E.2d 706, 710 (1992) (quoting Scott v. Commonwealth, 1 Va. App. 447, 452, 339 S.E.2d 899, 901 (1986)) (additional citation omitted); see Williams v. Commonwealth, 21 Va. App. 616, 466 S.E.2d 754 (1996) (en banc) (a venireman who worked as a correctional officer was not per se disqualified from being a juror in a case where the defendant was charged with assaulting a correctional officer). We noted in Williams that "[a] per se rule in Virginia has been approved only where the venireman knew of an accused's prior conviction for the same offense; stood in a near legal relationship to the victim of the accused; or was a

- 4 -

part owner of a victim bank," the relevant question being whether the juror could be fair and impartial.  21 Va. App. at 618-19, 466 S.E.2d at 756 (citations omitted).

In Lilly v. Commonwealth, 255 Va. 558, 569-70, 499 S.E.2d 522, 531 (1998), rev'd and remanded on other grounds, 527 U.S. 116, on remand, 258 Va. 548, 523 S.E.2d 208 (1999), the Supreme Court of Virginia held that when the

> officer's sole role in a criminal prosecution is as a witness, he is not a "party . . . ." Thus, a juror's relationship to such a police officer-witness does not require per se dismissal of that juror from the venire, and the juror may be retained if the trial court is satisfied that the juror can set aside considerations of the relationship and evaluate all the evidence fairly.

(Citations omitted).

"[T]he trial court's denial of a motion to strike a prospective juror for cause constitutes an exercise of discretion that will not be disturbed on appeal, unless manifest error appears on the record."  Pope v. Commonwealth, 234 Va. 114, 123-24, 360 S.E.2d 352, 358 (1987).  This deference is afforded because "the trial judge has the opportunity, which [the appellate court] lack[s], to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand . . . ."  Id.  In reviewing the trial court's determination of the question, the entire voir dire must be examined, not just isolated statements.

- 5 -

See Chrisman v. Commonwealth, 3 Va. App. 371, 373, 349 S.E.2d 899, 901 (1986) (citations omitted).

The voir dire of Juror Wade, in its entirety, makes clear that he could set aside his relationship to the officer-witness and fairly try the case. Wade did not discuss the case with his brother at any time. When asked if he would be unduly swayed by his relationship to Officer Charles Wade, or whether he would favor or tend to believe his brother's testimony because of the relationship, he responded in the negative, stating, "I'm an impartial person." He stated repeatedly and without equivocation that he could put aside the relationship.

The record clearly shows that the trial court did not err in refusing to strike Wade for cause, and we affirm the court's decision.

Affirmed.

The relevant portion of the voir dire to which Wade responded is as follows:

> [DEFENSE COUNSEL]:  Mr. Wade, your brother is one of the Commonwealth's witnesses?
>
> MR. WADE:  Yes.
>
> [DEFENSE COUNSEL]:  A Charlottesville police officer.  How long has he been a policeman in Charlottesville?
>
> MR. WADE:  Twenty-four, twenty-five years.
>
> *     *     *     *     *     *     *
>
> [DEFENSE COUNSEL]:  Okay.  Did you and your brother, who is a Charlottesville policeman who is one of the Commonwealth's witnesses here today, and what is his name by the way?
>
> MR. WADE:  Charles, Charlie.
>
> [DEFENSE COUNSEL]:  Charlie Wade.  Did you ever discuss the facts of this incident with your brother?
>
> MR. WADE:  No.
>
> *     *     *     *     *     *     *
>
> [DEFENSE COUNSEL]:  I think my question to you would be this, based on . . . having your brother, Charlie Wade, as one of the Commonwealth's witnesses, a long time Charlottesville Police Department [sic], if your brother were to take the stand and testify for the Commonwealth, and if my client took the stand and testified, wouldn't it be a natural . . . wouldn't it be natural for you to give your brother's testimony more weight than someone else you didn't know of that was accused of a crime?

MR. WADE:  Are you asking me would I or would it be natural?

[DEFENSE COUNSEL]:  How does that apply to you?

MR. WADE:  I'm an impartial person.

[DEFENSE COUNSEL]:  Yes sir, and I understand that you would . . . if you're allowed to serve on this jury you would take an oath and do your best to abide by [sic]. My question to you is recognizing that we all have feet of clay, and that we're human beings, wouldn't there be a tendency for you, no matter how hard you tried to be impartial, to give your brother, the police officer's testimony at least a little bit more credibility and believability than somebody like my client, Calvin Barrett, who you don't know and who's accused of serious crimes?

MR. WADE:  Truthfully, yes.

*     *     *     *     *     *     *


[PROSECUTOR]:  Is that something that in knowing that a juror is required to put aside the question of acquaintance or relationship, is that something you can do? Put aside your acquaintance with officers, your relationship with them?

MR. WADE:  Yes.

[PROSECUTOR]:  And do you have any question in your mind about that?

MR. WADE:  No, sir.

[PROSECUTOR]:  Are you hesitant in your feeling about whether you can put aside your acquaintance and relationship with . . .

MR. WADE:  I'm not hesitant of that.

*     *     *     *     *     *     *

- 8 -

[DEFENSE COUNSEL]:  Well, I've got a . . .
I'll just ask you the same question all over
again.  You remember my question?

MR. WADE:  You asked me if it was . . . I
think what you're getting at is you're
asking me whether there's any likelihood or
the vaguest little bit of favoritism.

[DEFENSE COUNSEL]:  Is it possible that you
will favor, even a little bit, your
brother's testimony over my client or some
witness for him who's not a policeman who
you don't know?

MR. WADE:  That's not the way you asked me
the first time as I recall.

[DEFENSE COUNSEL]:  All right, well what's
your answer to this question?

MR. WADE:  My answer is . . . would be, the
way you just now stated it, would be no.

[DEFENSE COUNSEL]:  All right.  What do you
recall my first question be [sic] to you?

[PROSECUTOR]:  Judge, I'm going to ask that,
that the juror be asked a question, not what
do you recall my last question to be.  I
think that's not an appropriate question.

THE COURT:  Well, I've got some real concern
about it, so maybe if I could pick up on it
at this point.

[DEFENSE COUNSEL]:  Yes, sir, please do.

THE COURT:  I understand you to say, sir,
that you would have some problem deep down
if there was a question of your brother's
credibility or a police officer's
credibility versus somebody you didn't know
taking the stand.

MR. WADE:  I did . . . when he initially
asked me that question, the way he phrased

- 9 -

it to me initially I did say [sic]. But then he asked it in a different way as far as if I would show any partiality on my brother's testimony, and my answer would be no.

THE COURT: All right, now maybe I'm not understanding your answer now. I mean, are you saying that you wouldn't deep down have any problem, in other words that it would not present a problem to you?

MR. WADE: My brother's testimony, being my brother, as far as his testimony, would not create a problem for me.

THE COURT: In other words you wouldn't have a tendency to believe your brother over somebody else you didn't know or a non police officer?

MR. WADE: I don't think I would, no, sir.

THE COURT: All right, sir. All right, now, any follow up?

[DEFENSE COUNSEL]: What about . . . whether it was your brother or some other police officer that you know or the fact that it's a Virginia State Trooper who's going to be one of the prime witnesses against my client, does their credibility in your eyes have any variance?

MR. WADE: No, sir.

*     *     *     *     *     *     *

[DEFENSE COUNSEL]: What did you have a . . . why did you answer the way you did when I asked the first question that you said there may be a problem?

MR. WADE: You stated, you stated your first question in respect to my testimony because of my feelings as far as my brother's testimony, you asked in a two fold [sic].

- 10 -

[DEFENSE COUNSEL]:  All right.

MR. WADE:  And the second part is when you went in . . . you asked a question initially, and then you went in and started emphasizing the fact more deeply as what I interpreted what you were trying to get from me because of my relationship with Officer Wade.

[DEFENSE COUNSEL]:  All right.

MR. WADE:  But I also stated that his testimony would not, his testimony I would judge just like I would Sergeant Payne's or Officer West, with whom I know [sic], Officer Bishop I know.  I would listen to their testimony and take judgment of that.

[DEFENSE COUNSEL]:  My question, my question is why did you say there might be a problem in any way because of my question?  What was the problem that I brought up that you agreed with?

MR. WADE:  I cannot word for word quote to you how you put it, but you asked me the question and I answered you initially that it would not affect my judgment.  And then you said in the most instinct or distinct way as far as something, and I said well, it probably would.

[DEFENSE COUNSEL]:  All right, then following up with that, isn't it possible, because of your brother being the police officer and being the Commonwealth's witness, that in spite of your best efforts, something, partiality wise or believability wise, will creep in to your filtering and thinking about the evidence in the case if you're allowed to sit as a juror that may be unfair to my client?

MR. WADE:  No.