COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Elder and Lemons
Argued at Chesapeake, Virginia


YOLANDA RAMOS WILSON
                                            OPINION BY
v.    Record No. 2781-98-1             JUDGE LARRY G. ELDER
                                         FEBRUARY 15, 2000
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF GLOUCESTER COUNTY
                  William H. Shaw, III, Judge

          Matthew G. Krumtum (Stone & Associates, P.C.,
          on brief), for appellant.

          Steven A. Witmer, Assistant Attorney General
          (Mark L. Earley, Attorney General, on brief),
          for appellee.


     Yolanda Ramos Wilson (appellant) appeals from her bench

trial conviction for the neglect or abuse of her child, "J.",

pursuant to Code § 40.1-103.  On appeal, she contends (1) the

trial court abused its discretion and violated her

constitutional rights by permitting the Commonwealth to amend

the indictment and (2) the evidence was insufficient to support

her conviction where the trial court said no single event

justified a guilty verdict.  We hold that the amendment to the

indictment did not constitute reversible error and that the

evidence was sufficient to prove appellant willfully caused J.

to be injured and cruelly treated.  Therefore, we affirm her

conviction.

I.

BACKGROUND

A.

MOTION TO DISMISS THE INDICTMENT

By indictment returned May 4, 1998, the Gloucester County grand jury charged that, on or about February 11 to 13, 1998, appellant

> did unlawfully and feloniously, while having
> custody, willfully and negligently, cause or
> permit the health of [J.], a minor child, to
> be injured, or willfully or negligently,
> cause him to be placed in a situation that
> his life or health was endangered, or cause
> or permit him to be tortured, or cruelly
> treated.

This indictment roughly paralleled the language of a portion of Code § 40.1-103 but alleged the child's "life or health was endangered," whereas the statute used the language "may be endangered."[1] (Emphasis added).

---

[1] The statute provides as follows:

> It shall be unlawful for any person
> employing or having the custody of any child
> willfully or negligently to cause or permit
> the life of such child to be endangered or
> the health of such child to be injured, or
> willfully or negligently to cause or permit
> such child to be placed in a situation that
> its life, health or morals may be
> endangered, or to cause or permit such child
> to be overworked, tortured, tormented,
> mutilated, beaten or cruelly treated.

Code § 40.1-103.

-

Appellant moved to dismiss the indictment on the ground that it contained an invalid attempt to rewrite a portion of the statute which this Court declared unconstitutional in Carter v. Commonwealth, 21 Va. App. 150, 462 S.E.2d 582 (1995). She asserted that Carter declared unconstitutionally vague the portion of the statute which read "or willfully to cause or permit such child to be placed in a situation that his life, health or morals may be endangered." (Emphasis added).

The trial court denied appellant's motion to dismiss the indictment and amended it to remove the portion declared unconstitutional in Carter. Following this amendment, the indictment charged that appellant "did unlawfully and feloniously, while having custody, willfully and negligently, cause or permit the health of [J.], a minor child, to be injured, or cause or permit him to be tortured, or cruelly treated."

Appellant continued to object, maintaining that the language removed required only appellant's passive involvement, whereas the remaining portions required more active involvement, and that the court could not be certain the grand jury would have issued the indictment if the indictment had included only the amended language. Appellant declined a continuance, arguing instead that the indictment should be dismissed.

The trial court held that the amendment of the indictment was permissible because it did not change the nature of the

-

offense.  It then arraigned appellant on the amended indictment, still drafted in the disjunctive but omitting the language tracking the portion of the statute previously declared unconstitutional.  Appellant entered a plea of not guilty.

B.

THE OFFENSE

The evidence admitted at trial established the following: On the morning of February 13, 1998, Kelly Wilson, father of the three-year-old victim, "J.", a learning disabled child, dropped J. off at "handicap preschool," putting him directly into the arms of Cynthia Finley, J.'s teacher's assistant.  A few minutes later, when Finley rolled up J.'s sleeves prior to breakfast as she did every school morning, she saw two roughly two-inch-long parallel bruises running lengthwise on J.'s left forearm. Finley had not noticed any injuries on J.'s arms when she rolled up his sleeves the previous day.  Subsequent examination of J. in the school nurse's office indicated that, in addition to the bruises on J.'s left forearm, J.'s right elbow was swollen, was tender to the touch and had scratches on it and he had scratches on his back.  Nurse Becky McDaniel described the bruises on J.'s left forearm as red and opined, based on their color, that they had been incurred within the previous twenty-four hours.

The guidance counselor called social services, and social worker Joe Wayland responded to J.'s school to begin an investigation.  In addition to the bruises on J.'s left forearm

-

and his swollen right elbow, Wayland observed a purple mark on one of J.'s upper arms, which was about two to three inches long, a large purple mark on J.'s upper back, and scratches across J.'s back. The scratches were in various stages of healing, and three were "very fresh." Wayland observed "some marks on J.'s forehead and on his face" and described several marks on J.'s leg which also were in various stages of healing. Wayland took photographs of J.'s injuries.

When Wayland questioned appellant about J.'s injuries, appellant "was very certain" J. had sustained the injuries in a fall from the jungle gym at school. When Wayland told her that J. could not have injured himself on the jungle gym at school because it had been removed from his classroom, appellant said J. could have fallen between the slats of a bunk bed at home. When Wayland asked appellant if she had noticed any injuries on the child, she said the child had no injuries when she bathed him the night before. Mr. Wilson told Wayland he had helped appellant bathe J. the night before and that he cleaned J. up and dressed him for school on the morning of February 13. Mr. Wilson said there were no marks on J. at either of those times.

Other evidence established that appellant may previously have abused J. and had been investigated by social services on several occasions. In October 1996, one-year-old J. was treated for a broken left femur, which required a cast. When Wayland

-

questioned them, appellant and Mr. Wilson reported that J. broke his femur stepping off a four-to-six-inch step.

Deann Dixon testified that she visited the Wilson home sometime in 1996. The Wilsons had just learned that J. had a learning disability, and Dixon heard appellant tell J. that he was stupid and was going to ride the "stupid bus." Dixon also observed appellant repeatedly pick J. up by his feet and swing him around in circles as J., screaming and crying, asked her to stop. While spinning him, appellant "came very close a lot of times to hitting his head on the coffee table." Dixon made an anonymous report to social services.

In February 1997, Mr. Wilson's cousin, Darryl Tyler, and his family were living with Mr. Wilson and appellant. Mr. Tyler, his wife Robin, and their ten-year-old son Christopher Brown all observed appellant "pluck" J.'s penis, which made him cry, and "smack him in the head." Mrs. Tyler testified that, on one occasion, appellant beat J. with a wooden spoon for about twenty minutes as he lay crying on the kitchen floor in a fetal position. Mr. Tyler also observed appellant use her foot to pick J. up by his shirt and "slam[] him down on his butt," which appellant said J. did not like. Deann Dixon confirmed the "smacking" incident and said appellant told her that she hated J.

On July 5, 1997, Mr. Wilson's cousin, Felissa Leisure, changed J.'s diaper at a family reunion. While she was doing

-

so, J. "seemed to wince and say, 'ow, ow, ow,'" which prompted Leisure, the daughter of a former social services worker, to examine J. more carefully. Leisure saw marks "all over" J.'s arms, legs, back and face. Some were dark marks two to three inches long, some were "fresh wounds with scabs," and some were healed. She also observed, on J.'s upper left back, a bite mark which appeared to have been caused by an adult. When Leisure asked appellant about the bite marks, appellant laughed and said her younger daughter, Edy, who was about two years old, had done it. Leisure reported her observations to social services.

When social worker Wayland investigated Leisure's report on July 7, 1997, he observed and photographed two sets of bite marks on J.'s back. When Wayland questioned appellant, she said J.'s cousin, Asia, had bitten him a year earlier.

Dr. Robin Foster, the director of the pediatrics emergency room and child protective team at the Medical College of Virginia, examined the photos of J.'s injuries from February 13, 1998, and photos of earlier injuries also investigated by social services. She also examined J. on April 16, 1998. Foster testified extensively about the marks she observed in the photographs, stating that they were "purplish in color" and were "consistent with bruises." She explained that bruises usually are "blue and purple through anywhere from 48 to 72 hours out to two weeks in the healing process." She testified that the location of the bruises and their shape and number caused her to

-

be "concern[ed] that they were not accidental injur[ies]." Marks on J.'s back, right leg and thigh were linear, and on the leg, there were "some looped marks visible," which were "consistent with whip marks."  Foster testified that J.'s left and right arm bruises were consistent with a non-accidental injury caused when a child's arm is "grabbed hard and the person's hand actually" causes the injury.

Regarding J.'s 1996 broken femur, Foster testified that the femur is a very large bone in the body and not easily fractured in children because a child's bones are less brittle than an adult's.

Foster also examined the July 7, 1997 photos taken of the bite marks on J.'s back.  She testified that the nature of the bite on J.'s left shoulder was consistent with the dental pattern of an adult and inconsistent with the dental pattern of a child.

The Commonwealth also offered the testimony of Investigator Vance Richards, who took a statement from Mr. Wilson upon his arrest on March 4, 1998.  Wilson said that on the evening of February 12, 1998,

> [J.] disobeyed my verbal commands to quit
> packing the toilet with toilet paper after
> several times.  I then grabbed his arm and
> spanked him on his butt being upset for the
> water and feces on the floor.  In reference
> to the picture where there is swelling from
> the left ear is where I had grabbed him by
> the ear numerous times because he tends to

-

walk away when I'm verbally disciplining
him.

In appellant's case-in-chief, she offered the testimony of
Mr. Wilson, who also had been charged under Code § 40.1-103 but
pleaded guilty to a lesser offense in exchange for dismissal of
the greater charge.  Mr. Wilson, a convicted felon, repeated the
statement he had given to Investigator Richards, saying he had
punished J. on the evening of February 12, 1998, when J. caused
the toilet to overflow.  Mr. Wilson said, "I pretty much just
grabbed him and smacked him on his butt."  He did not think he
grabbed or hit J. hard enough to bruise him.  He said appellant
did not see him administer the spanking and that he did not tell
her about it.  Mr. Wilson said that when he dressed J. for
school the following morning, J. did not have any marks, bruises
or scratches and that he did not know where the marks came from.
He denied ever seeing appellant "do anything inappropriate" to
J. and testified that he knew she would not abuse him.

In convicting appellant, the trial court commented
extensively on the evidence:

> [W]e start in '96 with a broken femur
> . . . .  [I]t's unusual.  But I don't draw
> really any conclusion from that.
> The next incident we hear about, the
> incidents in February [1997], I suspect that
> they happened, but not to the extent that
> Darrell Tyler and his wife say. . . .  I
> think [appellant] flicked [J.'s] penis.  I
> think she slapped him on the head.  Again,
> but not to the extent that the testimony led
> to.

-

We come to the bite . . . marks . . . . And what Dr. Foster was saying, that these bite marks, the ones that she looked at show adult bite marks. And what bothers me is that [appellant] comes up with that the child was bitten by two different people, both children[,] at two different times.

So when we get to February of '98 we have a history, or certainly a suggestion of a history of abuse. And it takes it beyond that parent overdoing it on one occasion, or even two occasions. . . .

Now, Mr. Wilson testified that he grabbed [J.'s] . . . left arm, but even he said it wasn't enough to cause the bruising. But the doctor is also describing what appear like whip marks on the . . . back of the legs. And we know they exist and we have heard no explanation for that.

The parties, especially [appellant], gave inconsistent stories as to how these got there. So the conclusion that I'm drawing from this is that [J.] is an abused child. I don't know why [appellant] does what she does. . . .

*     *     *     *     *     *     *

. . . I think there is sufficient evidence to find her guilty based on all the evidence, and I understand why the Commonwealth presented the background that it did. It set up the attitude, the feeling that [appellant] had for the child. I think she has no one incident. I don't think there is any one incident that I heard that would give rise in and of itself to a conviction.

But I think all of these things that occurred around February 13th[, 1998,] are too overwhelming, especially given the history of her attitude toward the child in matters of discipline.

-

II.

ANALYSIS

A.

AMENDMENT OF THE INDICTMENT

An accused has a constitutional right, under both the United States and Virginia Constitutions, to be informed of the "cause and nature of the accusation against him."  Hairston v. Commonwealth, 2 Va. App. 211, 213, 343 S.E.2d 355, 357 (1986) (citing Va. Const. art. I, § 8); Ronald J. Bacigal, Virginia Criminal Procedure § 13.1 (3d ed. 1994) (noting that Due Process Clause of United States Constitution also requires accused be given clear notification of offense charged).  However, one accused of a violation of the laws of the Commonwealth has no constitutional right to indictment by a grand jury.[2]  See Farewell v. Commonwealth, 167 Va. 475, 484, 189 S.E. 321, 325 (1937) (noting that Virginia's constitution does not mention grand jury).  Code § 19.2-217 provides that "no person shall be put upon trial for any felony, unless an indictment or presentment shall have first been found or made by a grand jury

_____

[2] The Fifth Amendment to the United States Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  However, the United States Constitution's grand jury requirement has not been made applicable to the states.  See Malloy v. Hogan, 378 U.S. 1, 4 n.2, 84 S. Ct. 1489, 1491 n.2, 12 L. Ed. 2d 653 (1964) (citing Hurtado v. California, 110 U.S. 516, 4 S. Ct. 111, 28 L. Ed. 232 (1884)).

in a court of competent jurisdiction or unless such person"
waives, in writing, the right to indictment or presentment.
"[T]he requirement for indictment is not jurisdictional and
constitutionally imposed but is only statutory and procedural."
Triplett v. Commonwealth, 212 Va. 649, 650-51, 186 S.E.2d 16, 17
(1972).

Although the complete absence of an indictment, where not
waived, may be reversible error, see id. at 650-51, 186 S.E.2d
at 16-17 (decided under Code § 19.1-162, predecessor to Code
§ 19.2-217), the legislature has provided for liberal amendment
of indictments once returned by a grand jury, see Code
§ 19.2-231.

> If there be any defect in form in any
> indictment, presentment or information,
> . . . the court may permit amendment . . .
> at any time before the jury returns a
> verdict or the court finds the accused
> guilty or not guilty, provided the amendment
> does not change the nature and character of
> the offense charged. . . . [I]f the court
> finds that such amendment operates as a
> surprise to the accused, he shall be
> entitled, upon request, to a continuance of
> the case for a reasonable time.

Id. Pursuant to Code § 19.2-231, therefore, the indictment to
which an accused is entitled under Code § 19.2-217 "includes an
indictment which has been properly amended by the court."
Farewell, 167 Va. at 485, 189 S.E. at 325 (decided under
predecessors to Code §§ 19.2-217 and 19.2-231, § 4866 of the
Code of 1887 and § 4877, enacted in 1919).

-

"'If a statute . . . makes it a crime to do this, or that, or that,' mentioning several things disjunctively, 'the indictment may . . . embrace the whole in a single count; but it must use the conjunctive "and" where "or" occurs in the statute . . . .'" Mitchell v. Commonwealth, 141 Va. 541, 551, 127 S.E. 368, 372 (1925) (quoting 1 J. Bishop, Criminal Procedure § 334). Code § 19.2-231 permits amendment of an indictment which includes various intents improperly drafted in the disjunctive. See Slusher v. Commonwealth, 196 Va. 440, 83 S.E.2d 719 (1954) (decided under Code § 19-151, predecessor to Code § 19.2-231). In Slusher, the indictment alleged that the accused did "'attempt to maliciously, unlawfully and feloniously assault, cut and wound . . . with the intent to maim, disfigure, disable or kill.'" Id. at 446, 83 S.E.2d at 722 (emphasis added). When the accused objected during trial to this disjunctive drafting, the Court applied former Code § 19-151 to uphold the trial court's actions in amending the indictment to charge in the conjunctive, rearraigning the accused, and allowing him to enter a new plea. See 196 Va. at 446, 83 S.E.2d at 722.

Implicit in this conclusion is that the disjunctive drafting of the intents was merely a "defect in form" subject to remedy by amendment and that amending the indictment to charge these intents in the conjunctive did not change the nature or character of the offense. Therefore, the fact that the grand jury may have indicted the accused for having acted with one

-

intent did not preclude his conviction for violating the statute with a different intent, also included in the indictment.

Although the disjunctive drafting of multiple criminal intents in Slusher is not identical to the disjunctive drafting of the multiple criminal acts in appellant's case, we hold that the facts in Slusher are sufficiently analogous to be controlling.  In Slusher, the grand jury found probable cause to believe appellant committed the charged criminal act with at least one of four enumerated criminal intents.  In appellant's case, the grand jury found probable cause to believe appellant committed at least one of the three criminal acts listed in Code § 40.1-103.  The fact that the trial court may have convicted Slusher for acting with a different one of the four enumerated criminal intents or appellant for committing a different one of the three enumerated criminal acts is not dispositive.[3]  Our analysis is not altered simply because, prior to trial, the trial court struck from the indictment one of the three acts

---

[3] Here, the trial court amended the indictment to strike the portion of the statute declared unconstitutional.  Unlike in Slusher, it did not amend the indictment to charge the two remaining acts in the conjunctive rather than the disjunctive. However, appellant did not specifically object to the indictment's disjunctive language, focusing instead on the argument that the indictment, as amended, could not be said to have been found a true bill by the grand jury because it was drafted in the disjunctive and one of the three alternative grounds, upon which the grand jury could have relied, had been struck.  Other than arguing the entire indictment should be dismissed, appellant did not object to proceeding to trial based on the fact that the remaining language was drafted in the disjunctive.

appellant was alleged to have committed, based on the unconstitutionality of that portion of the statute.

Appellant contends that the amendment changed the nature and character of the offense charged. We disagree.

Appellant was aware, upon the return of the indictment by the grand jury, that she was charged with serious acts of child abuse under Code § 40.1-103. Under the indictment as originally drafted, appellant was charged with having violated the statute in any of three different ways: by willfully and/or negligently (1) causing or permitting the health of the victim to be injured; (2) causing the victim to be placed in a situation in which his life or health was endangered; or (3) causing or permitting the victim to be tortured or cruelly treated.[4] Appellant was on notice that she could be convicted of violating the statute based on having committed any of the three categories of enumerated acts; that she did not know under which clause or clauses the grand jury returned a true bill is not material to the issue on appeal. Cf. Buchanan v. Commonwealth, 238 Va. 389, 397-98, 384 S.E.2d 757, 762-63 (1989) (upholding indictment drafted in the disjunctive under which accused "was on notice that he had to defend against seven possible groupings of murder victims, any one of which was sufficient to constitute

_____

[4] We note, under the facts of this case, that whether the indictment was drafted in the disjunctive or conjunctive is not relevant to whether it provided appellant with notice of the nature or character of the offense.

-

capital murder" and that, under that indictment, "there's no way [the accused did not] know what [he was] charged with"); Slusher, 196 Va. at 446, 83 S.E.2d at 722 (holding implicitly that amending indictment alleging four intents in the disjunctive to charge those same four intents in the conjunctive did not change the nature or character of the offense). We hold that when the trial court struck the second clause as unconstitutional, this amendment merely narrowed the scope of the indictment. It did not change the nature or character of the offense charged in the indictment. Further, appellant made no claim that the amendment operated as a surprise and declined the court's offer of a continuance.

Appellant contends that, by eliminating the possibility of conviction under clause (2), the amendment changed the nature of the offense from passive to active, thereby changing the nature and character of the offense. Again, we disagree. As set out above, appellant could originally have been convicted of violating the statute in any of three ways. However, after the amendment, if the trier of fact found that appellant violated the second clause of the statute, it could not convict her at all; it could convict her only if her actions violated the first or third clauses of the statute. Thus, the amendment narrowed the scope of the indictment and did not change its nature or character.

-

For these reasons, we hold that the trial court's refusal to dismiss the indictment was not error.

B.

SUFFICIENCY OF THE EVIDENCE

When considering the sufficiency of the evidence on appeal in a criminal case, we view the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.  See Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  The credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination.  See Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989).  The judgment of the court will not be set aside unless it is plainly wrong or without supporting evidence.  See Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).

The indictment alleges that appellant violated Code § 40.1-103 by willfully or negligently causing or permitting the health of J. to be injured or willfully or negligently causing or permitting him to be tortured or cruelly treated.  The trial court, in saying, "I don't know why [appellant] does what she does," implicitly found that appellant caused the injuries to J. and did not simply permit someone else to inflict them.  The evidence supports a finding that she did so willfully.

-

"Willful, when used in a criminal statute, 'generally means an act done with a bad purpose; without justifiable excuse . . . . The word is also employed to characterize a thing done without ground for believing it is lawful.'" Richardson v. Commonwealth, 21 Va. App. 93, 99, 462 S.E.2d 120, 123 (1995) (quoting Snead v. Commonwealth, 11 Va. App. 643, 646, 400 S.E.2d 806, 807 (1991)). "'[T]he correct application [of willfully] in a particular case will generally depend upon the character of the act involved and the attending circumstances.' . . . In the absence of direct evidence of intent, willfulness must be established through circumstances." Lambert v. Commonwealth, 6 Va. App. 360, 363, 367 S.E.2d 745, 746-47 (1988) (quoting Lynch v. Commonwealth, 131 Va. 762, 766, 109 S.E. 427, 428 (1921)).

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983). However, "the Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993).

Here, the evidence is sufficient to prove that, on or about February 11 to 13, 1998, appellant willfully caused J.'s health to be injured and willfully caused him to be cruelly treated.

-

Viewed in the light most favorable to the Commonwealth, the evidence established that J. displayed multiple fresh bruises on his arms, back and legs when he arrived for pre-school on February 13, 1998. During that period of time, J. resided with appellant and his father. No evidence established that anyone else had care or custody of J. during that time other than his teachers at pre-school, and no evidence established that J. sustained any injuries at school during that period of time. Mr. Wilson said he had disciplined J. on the evening of February 12, 1998, by grabbing his arm and spanking his bottom, but Wilson denied that his actions could have caused the bruising. The medical testimony indicated that on February 13, 1998, J. had extensive linear bruising on his arms, shoulder, back, buttocks and right leg. The bruises were purplish in color, which indicated they were fresh, and some of them bore loop marks, which were consistent with J.'s having been whipped and inconsistent with accidental injury. The bruises on J.'s arms, which were circumferential, were inconsistent with an accidental injury and consistent with a non-accidental injury occurring when a child's arm is "grabbed hard and the person's hand actually" causes the injury. The only reasonable hypothesis flowing from this evidence is that appellant inflicted J.'s injuries.

Other evidence established that appellant acted willfully. Appellant previously had said she "hated" J., who was learning

-

disabled, and she had abused him on several occasions during the previous year.  She "pluck[ed]" his penis, making him cry, on at least one occasion while changing his diaper and "smack[ed] him in the head" on another.  On a third occasion, she used her foot to pick him up by his shirt and "slam[] him down on his butt." On a fourth occasion, she beat him with a wooden spoon for about twenty minutes as he lay in a fetal position, crying, on the kitchen floor.  On several of these occasions, social services conducted an investigation.  Although these prior incidents do not constitute direct evidence that appellant was responsible for J.'s extensive bruises on February 13, 1998, they were relevant to establish appellant's feelings toward J. and her intent in that she knew her actions were unlawful and likely to produce injury and she engaged in them anyway.  See 1 Charles E. Friend, The Law of Evidence in Virginia § 12-15 (4th ed. 1993).

Further, despite appellant's contentions, the trial court's statement that no single incident alone would give rise to a conviction does not compel the conclusion that the evidence was insufficient to support her conviction.  "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'"  Stamper v. Commonwealth, 220 Va. 260, 273, 257 S.E.2d 808, 818 (1979) (quoting Karnes v. Commonwealth, 125 Va. 758, 764, 99 S.E. 562, 564 (1919)).  As long as those

-

circumstances exclude all reasonable hypotheses of innocence flowing from the evidence, they are sufficient to support a criminal conviction.  The circumstantial evidence here meets that standard.

For these reasons, we hold the trial court did not err in refusing to dismiss the indictment or in holding the evidence was sufficient to support appellant's conviction.  Therefore, we affirm.

<u>Affirmed.</u>